**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARREN D. COLEMAN, | : | |
| | : | Civil Action No. 15-cv-00847 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**MOTION FOR SUMMART JUDGMENT**

*A. Undisputed Material facts regarding the classification and screening for*
*potential for abuse or victimization of Coleman and Ausley*

1.   Every inmate who enters the Pennsylvania Department of Corrections starts at a diagnostic center.  Exhibit A, ¶ 4.

2.   The procedures at the diagnostic and classification center are set out in Department of Corrections Procedures manual 11.2.1, Section 2.B.   Exhibit A, ¶ 5; Exhibit A-1.

3.   During the orientation at the diagnostic center, all inmate receive information on sexual abuse/assault prevention and intervention.  Exhibit A, ¶ 6;

Policy 11.2.1, Section 2.a.D.  Exhibit B.  This information includes training on how to prevent a sexual assault in prison and how to report a sexual assault.

4.   At the diagnostic center, the inmates receive their initial classification. Exhibit A, ¶ 7.

5.   The staff at the diagnostic center evaluates an inmate's custody level, separations, programming needs, security needs, age, and medical and psychological needs to determine an appropriate facility placement. Exhibit A, ¶ 8; Exhibit A-1. *See* 11.2.1, Section 2. B.12; Exhibit B.

6.   Psychological testing is also done on the inmate at the diagnostic and classification center.  Part of this testing involves screening for potential violence or or potential victimization.  Exhibit A, ¶ 9; Exhibit A-1. *See* 11.2.1, Section 2. B.12.

7.   At the diagnostic and classification center, the integrated case summary is completed, which deals with an inmate's criminal history, any institutional risks that may be involved, social demographic information, such as background and education level.  Exhibit A, ¶ 10.

8.   As part of the integrated case summary, the counselor does a risk assessment of the inmate.  The integrated case summary contains information about an inmate's crimes and misconducts in prison.  Exhibit A, ¶ 11.

9.  Pursuant to DC-ADM 008, Section 2 A, Prevention and Screening, in effect during the time period related to this case, every inmate is screened by medical staff upon reception to the Department of Corrections and upon transfer. Exhibit O-8, p. 12.

10.  The screening "shall include review of any indication of a history of sexual victimization or sexual predatory behavior."  Exhibit O-8, p. 12. (DC-ADM-008, Section 2.A. Prevention/Screening. 1.

11. "The review includes an inmate's misconduct history, prior program codes, and the "security concerns" tab in the Unit Management System on DOCNet." Exhibit O-8, p. 12. (DC-ADM-008, Section 2.A. Prevention/Screening. 1-5.

12.  After the review, inmates who are identified as sexual predators are assigned a Z-Code, and inmates who are identified as potential victims are considered for placement in a Special Needs Unit (SNU).  Exhibit O-8, p. 12. (DC-ADM-008, Section 2.A. Prevention/Screening. 1-5).  All concerns noted by medical or psychology staff and communicated to the unit manager so appropriate housing assignments can be made.  *Id.*

13.  During classification, the Pennsylvania Additive Classification Tool (PACT) is administered to assign inmates a custody level.  Exhibit A, ¶ 17.

14.  The PACT is an institutional risk assessment tool which uses a scoring system that evaluates risk and stability factors to assign an inmate's custody level. Exhibit A, ¶ 18.

15.  The PACT considers the inmate's criminal history, their prior history, any escape history, any misconduct history. It also considers stability factors like whether an inmate is married or employed. Exhibit A, ¶ 19.

16. The PACT is based on the National Institute of Corrections additive classification model.  The National Institute of Corrections has validated the PACT tool, finding that there are a strong correlations between the classification levels and inmate misconduct.   Exhibit A, ¶¶ 20-21.

17.  There are five custody levels that result from the PACT tool: one through five.    Level 1 is community corrections, Levels 2-4 are general population, and Level 5 is restricted housing.  Exhibit A, ¶¶ 22-23.

18.   Level two inmates are minimum supervision, Level 3 inmates are medium, Level 4 are close supervision, and Level 5 inmates are in Restrictive Housing.  Exhibit A, ¶¶ 24-25.

19.  Typically, Level 2 inmates are not housed with Level 4 inmates, but level 3 inmates can be housed with either Level 2 or Level 4 inmates. Exhibit A, ¶ 26.

20.  Inmates are reclassified on an annual basis.  At each reclassification, the PACT tool is re-administered to determine changes in a custody level. Exhibit A, ¶ 27.   The reclassification takes into consideration additional factors based on an inmate's institutional adjustment.  *Id*.

### *Inmates are Continuously Evaluated for Double Celling Compatability*

21.  Beginning at the Diagnostic and Classification center, and continuing throughout an inmate's stay with the Department of Corrections, an inmate is continually evaluated for the necessity of a Z-Code, which is a designation that requires single-cell status.   Exhibit A, ¶ 28; Exhibit A-1, pp. 8-9.

22.  A Z code can be assigned at any time during an inmate's incarceration. A Z Code can arise either out of a staff-initiated housing evaluation, or because an inmate requested review for a Z code. Exhibit A, ¶ 29; Exhibit A-1, pp. 8-9.

23.  According to DC-ADM-008, Section 2. A. Prevention/Screening, inmates who are identified as sexual predators as a result of the required screening are assigned a Z Code.  Exhibit O-1, p. 12.

24.  Policy 11.2.1, Section 5 provides a list of criteria that which trigger a requirement that staff shall carefully review an inmate for a Z Code.  Exhibit A-1; Exhibit A, ¶ 31.

5

25.   Among those criteria that require careful review are (1) An inmate who has been evaluated by psychiatric or psychological staff as being dangerous to others, (2) inmates who have a documented history of aggressive or predatory behavior towards cell partners, or who staff has reason to believe would exhibit assaultive or predatory behavior towards cell partners, and (3) an inmate who staff believes may be victimized as a result of double celling. Exhibit A-1; Exhibit A, ¶ 32.

26.   When reviewing an inmate for "Z Code" housing status, facility staff complete review of appropriate documents, which include misconduct reports, recommendations from medical and/or psychiatric staff, and reports from others staff that have knowledge of the inmate's adjustment and behavior.   Exhibit A-1, p. 9; Exhibit A, ¶ 33.

27.   If there is a recommended change, staff circulates a DC-46, Vote Sheet along with other relevant information to the Facility Manager/ designee who makes the final decision.  Exhibit A-1, p. 9; Exhibit A, ¶ 34.

28.   DC-ADM-11.2.1, Section 5 contains special provisions for inmates assigned Z Codes because staff had reason to believe the inmate would be assaultive towards cell partners.  Such inmates are automatically a Custody Level 4 or greater on the PACT tool.  Exhibit A, ¶ 35; Exhibit A-1.

29.    Moreover,   staff are required to make a notation in the "Security Concerns" section of the Unit Management System, specifying the type of assaultive behavior (e.g., physical/sexual). Such inmate may have the "Z" code removed only if he/she can demonstrate to staff that he/she no longer poses a threat to the cell partner(s), and that the code is no longer needed.  Exhibit A-1, p. 29.; Exhibit A, ¶ 35.

30.  A Z-Code that was assigned to an inmate for sexually assaultive behavior in prison cannot be removed without the approval of the Regional Deputy Secretary. Exhibit A-1, p. 29.; Exhibit A, ¶ 36.

### *Reception at an Inmate's Home Institution*

31.  After the inmate is classified at the Diagnostic Classification Center, he is assigned a home institution. Exhibit A-1, p. 12  (11.2.1, Section 5.A.); Exhibit A, ¶ 37.

32.  When an inmate arrives at his home institution, he meets with an Initial Reception Committee. Exhibit A-1; Exhibit A, ¶ 38.

33.  The procedures for the inmate's housing after reception at his home facility are spelled out in Procedures Manual 11.2.1, Exhibit A-1 (Section 5.A. Exhibit A-1, p. 12.)

34.  The Initial Reception Committee (IRC) interviews the inmate and reviews available records to determine an appropriate housing status. Procedures Manual 11.2.1, Section 5.A.  Exhibit A-1; Exhibit A, ¶ 40.

35.   The IRC informs  the inmates of the conditions which apply to double celling including procedures for requesting consideration for termination of double celling and instructions for inmates to follow to inform staff of any problems arising as a result of double celling. Exhibit A-1 (Procedures Manual 11.2.1, Section 5.A.); Exhibit A, ¶ 41.

36.  The IRC also goes over the inmate's cellmate preferences.  According to 11.2.1 Section 5, B.2.b, the inmate's preferences are accommodated to the extent possible, but the decision is based on available space unless there are security concerns.   Exhibit A-1 (Procedures Manual 11.2.1, Section 5.A.); Exhibit A, ¶ 42.

37.  An inmate's requests generally shall be accommodated if circumstances permit and provided there are no contra-indications (custody level, security needs, etc.) noted by staff. If the inmate does not express a preference, the double-cell assignment is made based on facility need (available bed space).  Exhibit A-1 (Procedures Manual 11.2.1, Section 5.A.); Exhibit A, ¶ 43.

38.  Through the process in place at the diagnostic center, where inmates are screened for assaultive behavior and the potential for victimization, the classification

process through the PACT, and because of the process in place in the Department of Corrections for double-celling, the potential cellmates for an incoming inmate at IRC have been pre-screened.  Exhibit A, ¶ 44.

39.   Any inmate who staff has reason to believe is potentially physically or sexually assaultive to a cellmate would have been given a Z-Code, and have been prohibited from having a cellmate.  Exhibit A, ¶ 45.

40.   If the potential cellmate does not have a Z-Code, the IRC is entirely justified in relying on the processes in place to know that other DOC staff have evaluated the potential cellmate and have made a decision that the potential cellmate does not pose a risk of harm to a future cellmate.  Exhibit A, ¶ 46.

41.   While ideally staff would be able to match the inmates based on age, height, weight, and balance of power, it is not always possible to do so.  Failure to match inmates in this manner, standing alone,  does not present a risk of harm to an inmate when there are no other identified security risks in celling the two inmates together.  Exhibit A, ¶ 47.

## *Classification History of Darren Coleman*

42.     During the time period relevant to this case, Darren Coleman was serving his second period of incarceration with the Pennsylvania Department of

Corrections, having previously served a sentence at SCI-Laurel Highlands. Exhibit I, Deposition p. 13, l. 12-15; Exhibit A, ¶¶ 48-50.

43.     Coleman began his first period of incarceration in the Department of Corrections on or about August 13, 2009, when he began serving a 9 month to 2 year sentence out of Delaware County for a Driving Under the Influence.  The sentence of incarceration was followed by a three year probation period.  Exhibit A, ¶ 49.

44.     Coleman was received at the reception center at SCI-Graterford and then transferred to the Diagnostic Center at SCI-Camp-Hill on August 21, 2009, before he was transferred to Laurel Highlands, his home intuition on October 8, 2009 where he served until being paroled on May 31, 2010.  Exhibit A, ¶¶ 50-52.

45.  Coleman had multiple previous cellmates, including those younger and larger than him, but never had any problems with those cellmates.  Exhibit I, Deposition, p. 14, l. 5-25; p. 15, l. 1-6.

46.  Upon completion of his parole, Coleman began serving additional probation that followed his sentence of incarceration.  Exhibit A, ¶ 52.

47.  Coleman violated that probation and was re-sentenced to a second period of incarceration, a 1 year to 2 year sentence in the state prison system, which began on January 24, 2014 when he was received at SCI-Graterford.  Exhibit A, ¶ 53.

48.   On January 24, 2014, Coleman was screened for sexual abuse or victimization pursuant to DC-ADM 008, Section 2 A, Prevention and Screening. Coleman was not identified as an inmate who was at risk for victimization.  Exhibit A-12, p. 2.-5.

49.  Coleman was transferred to the diagnostic center at SCI-Camp Hill on January 31, 2014 where he underwent diagnostics and classification. Exhibit A, ¶ 55.

50.  On January 31, 2014, upon arriving at SCI-Camp Hill, Coleman was again screened for sexual abuse or victimization pursuant to DC-ADM 008, Section 2 A, Prevention and Screening.  Exhibit A-12 contains the notation in Coleman's medical records that the screening was conducted and Coleman was not identified as an inmate who was at risk for sexual victimization. Exhibit A-12, pp. 6-7.

51.   At his orientation on February 3, 2014, Coleman received a training course on Sexual Abuse/Assault Prevention and Intervention.  Exhibit A, ¶ 57; Exhibit A-2; Exhibit I, Deposition p. 21, l 17-25.

52.  On February 5, 2014, Coleman completed an "Initial Reception Mental Health Questionnaire" where he was screened for, among other things, the potential for sexual victimization.  Exhibit A-3; Exhibit A, ¶ 58.

53.  On the questionnaire, Coleman was asked specifically if he had ever been sexually assaulted during incarceration, or if he had any concerns that he would be pressured into unwanted activity during incarceration.  He answered both questions "no."  Exhibit A-3; Exhibit A, ¶ 59.

54.  The Diagnostic Center completed a Mental Health Screening report on Coleman on February 6, 2014, which took into account a clinical interview, a DCC PA Clinical Risk Assessment, and a Personality Assessment Inventory.  Exhibit A-4; Exhibit A, ¶ 60.

55.  The screening report found that Coleman's risk of victimization was not identified, meaning that staff found that Coleman was not at a particular risk of victimization.  *Id.*; Exhibit A, ¶ 61.

56.  The screening report noted that although Coleman scored "Extremely Low" on his Beta III I.Q. test, there was no indication of remedial functioning during his clinical interview. *Id.*; Exhibit A, ¶ 62.

57.  There were no security concerns with double celling Coleman flagged at the diagnostic center, and Coleman was not assigned a Z-Code.  Exhibit A, ¶ 63.

58.  Coleman testified at his deposition that he did not have any reason to think he was vulnerable to being sexually assaulted.  Exhibit I, Deposition p. 22, l. 9-15.

59.  At initial classification, Coleman's scoring on the PACT tool resulting in him being assigned a Custody Level 3 for medium supervision.  It is likely that his history of failing to report to his probation officer played into his score.  Exhibit A, ¶ 64; Exhibit B-2; Exhibit A-11.

60.  Coleman was assigned to SCI-Smithfield, which is an institution appropriate for Level 3 inmates. Exhibit A, ¶ 65.

61.  On March 6, 2014,  upon arriving at SCI-Smithfield, Coleman was again screened for sexual abuse or victimization pursuant to DC-ADM 008, Section 2 A, Prevention and Screening.   Coleman was not identified as an inmate who was at risk for victimization.  Exhibit A, ¶ 66; Exhibit A-12, pp. 8-9.

*Relevant Classification History of Gary Ausley*

62.  Gary Ausley arrived at the Department of Corrections in March 2010 to serve a 15 to 30 year sentence on a Third Degree Murder conviction.  Exhibit A, ¶  67.

63.  Ausley was initially received at SCI-Graterford on March 30, 2010, and transferred to SCI-Camp Hill for diagnostics and classification on April 21, 2010. . Exhibit A, ¶  68.

64.     While at SCI-Camp Hill, Ausley underwent the same screening, testing and classification process that Coleman did.  Exhibit A, ¶  69.

65.   Prior to the allegations by Coleman, Ausley had no known history of sexual assault or sexual harassment.  Exhibit A, ¶  70.

66.   There were no security concerns with double-celling Ausley flagged at the diagnostic center, and Ausley was not assigned a Z-Code. .  Exhibit A, ¶  71.

67.     Ausley was transferred from SCI-Camp Hill to SCI-Fayette on June 1, 2010, from SCI-Fayette to SCI-Somerset on March 22, 2012, and to SCI-Smithfield on September 10, 2013.   Exhibit A, ¶  72.

68.     From his initial reception into the Department of Corrections in 2010 through March 6, 2014, Ausley has never had a misconduct for assaultive or violent behavior during his incarceration.  Exhibit A, ¶ 73; Exhibit A-5.

69.   Ausley had his annual reclassification at SCI-Smithfield on September 27, 2013.  Exhibit A-6.

70.     At his reclassification, the PACT tool was administered by his counselor C. Christie.  Exhibit A, ¶  75; Exhibit A-6.

71.  The reclassification information shows that at the time of reclassification, Ausley had no disciplinary reports during the prior 12 months. Exhibit A-6; . Exhibit A, ¶ 76.

72.  The reclassification information also shows under Institutional Violence: "No weapon/Injury More than 10 years or None", meaning there was no significant history of prison violence.  Exhibit A-6; Exhibit A, ¶ 77.

73.  Ausley's September 27, 2013, PACT tool score yielded a custody level 3.  Exhibit A, ¶ 78; Exhibit A-6.

74.  After transfer to SCI-Smithfield, Department records show that Ausley wrote requests for staff to review him for single cell status (Z-Code). .  Exhibit A, ¶ 79.

75.  Single cells are highly sought after in the Department of Corrections and cell space at all of the Department of Corrections institutions is at a premium. Exhibit A, ¶ 80.

76.  If single cells were issued to all inmates who requested single cells, there would be a tremendous overcrowding problem.  Exhibit A, ¶ 81.

77.  Inmates are well aware of the 11.2.1, Section 5 policy on single cells, and many inmates therefore know what to say in order for staff to trigger single cell consideration.   Exhibit A, ¶ 82.

78.  In particular, inmates are known to make false statements about mental health conditions, or make vague, false statements about being a danger to future cellmates in order to attempt to manipulate staff into granting the inmate single cell status.   Exhibit A, ¶  83.

79.  If an inmate's own self-report that he would be a danger to a future cell-mate would be enough to require single-cell status, then inmates could easily manipulate their housing status by making such statements with the secondary interest in gaining a single cell or Z-Code. .  Exhibit A, ¶  84.

80.  Instead, an inmate's unit staff works closely with psychological staff, and also looks an inmate's entire record to determine if there are objective factors to warrant single cell status, such as violence towards cellmates in the past, assaultive misconducts, or confirmed mental or physical health problems that require an inmate to be single celled.  Exhibit A, ¶  83.

81.  On October 2, 2013, Ausley's cumulative adjustment notes show that he talked to his counselor, Clarence Christie, and requested a single cell because Ausley self-reported that he could not have a cellmate because he gets paranoid thinking that people are suspicious of him, and when he doesn't take his medicine he loses control.   Exhibit A-7.

82.    The same entry notes that Mr. Christie spoke with SCI-Smithfield Psychiatrist Dr. Dolphin, who advised him that Ausley was medically stable to have a cellmate and that Ausley "just wanted a Z-Code however possible."  *See* Exhibit A-7.

83.  On October 7, 2013, Ausley's counselor circulated a vote sheet regarding Ausley's request for single-cell status.  Exhibit A-8.;  Exhibit A, ¶  88.

84.  The vote sheet noted that Ausley had seven misconducts, but none were related to weapons or drugs.  The vote sheet noted that psychiatrist Dr. Dolphin stated that Ausley did not require a Z-code for mental health reasons, and that Ausley's counselor felt the Z-Code request was out of convenience and not a necessity.  Exhibit A-8.

85.   The vote sheet was initialed by a Psychologist who noted "no mental health reason at this time."  Exhibit A-8.

86.  The vote sheet was signed Security Captain Goss with the notation that "nothing in history to indicate one would be justified."  Exhibit A-8.

87.  It was noted in other sections that "No support by security or psych" and "Psych does not support a Z-Code" and that it was perceived that Ausley was a "manipulator".  Exhibit A-8.

88.   None of the staff members who signed off on the vote sheet felt that a Z-Code was warranted.   Exhibit A, ¶ 93; Exhibit A-8.

89.   The result of the vote sheet was that Ausley's request was denied.  Exhibit A-8.

90.   On November 12, 2013, after Ausley was informed that his vote sheet for single-cell status was denied, he filed a grievance.  *See* Exhibit A-9, p. 2.

91.   In the grievance, Ausley specifically referred to the provisions of 11.2.1, which indicates knowledge of the policy, and raises the question of whether Ausley's statements in the grievance were self-serving attempts to invoke the provisions in the policy to manipulate his housing status. Exhibit A-9, p. 2.

92.   Ausley wrote "I need my own space and it will happen one way or the other." Exhibit A-9, p. 2.

93.   Lisa Hollibaugh, the Grievance Coordinator at SCI-Smithfield issued Ausley a misconduct for "#17 threatening another person" due to that statement. Exhibit A-9, p. 1.

94.   Any words that are perceived as threatening are enough to cite an inmate with the misconduct charge in question.  Exhibit A, ¶ 99.

95.  Even a false or idle threat is disruptive in prison.  Therefore, to be issued and found guilty of the misconduct charge, there is no requirement that the inmate have any intention to carry out the threat, or that staff believed that the inmate intended to carry out the threat.  Exhibit C, ¶ 3, ¶ 5. .

96.  Inmates frequently will use threatening words in an attempt to manipulate their housing status or programming, and never intend to carry out the threat.  Exhibit C, ¶ 4.

97.  Idle or general threats made by inmates for the purpose of manipulating housing assignments are harmful to the administration of an orderly prison because they make it more difficult for staff to accurately assess the programming and housing needs of inmates.   Exhibit C, ¶ 5.

98.   The proper disciplinary charge for such manipulative uses of threatening words is "Threatening Another Person".  Exhibit C, ¶ 6.

99.  Amy Himes, the hearing examiner who found Ausley of the misconduct issued by Hollibaugh, has declared that the finding of guilt on the charge of "Threatening Another Person" should not be taken to mean that she found that Ausley actually intended to do harm to a person in the future, or that Ausley was in any way dangerous to a potential cellmate.  Exhibit C, ¶ 7.

100.  Himes took the statements Ausley made in his grievance as threatening words used for the purpose of secondary gain in attempting to manipulate his housing status by gaining single-cell status, and not as a serious threat to actually commit harm to another person.   Exhibit C, ¶ 8.

101.  The mere fact that Ausley was in a gang does not, standing alone, make him a security risk to be double celled, or likely to assault a potential cellmate. Exhibit A, ¶ 104.

102.  Similarly, the mere fact that Ausley was convicted of 3rd degree murder, standing alone, does not make him a security risk to be double celled, or likely to assault a potential cellmate.  Exhibit A, ¶ 105.

103.   On February 20, 2014, Inmate John Doe had a conversation with Superintendent Fisher around 9:45 AM.  Exhibit G, p. 15.

104.  Inmate John Doe advised Fisher that Ausley approached Inmate John Doe with a proposition regarding a fraudulent scheme for Ausley to obtain a permanent Z-Code.  Exhibit G, p. 15.

105.  Ausley proposed to have Inmate John Doe agree to cell with Ausley, and have Inmate John Doe then purport to attack Ausley.  Exhibit G, p. 15.

106.  Ausley schemed that he would obtain a permanent Z-Code, file a lawsuit, and that Ausley and Inmate John Doe would share the proceeds. Exhibit G, p. 15.

107.   Inmate John Doe memorialized the conversation in a request slip to Fisher dated February 20, 2014.  Exhibit G, pp.  15-16.

108.  Fisher referred the request slip to Lt. Goss from security.  Exhibit G. p. 15.

109.  Inmate John Doe was interviewed by security regarding his claims, prior to writing the request slip.  Exhibit G, Deposition p. 14, l. 20-22, p. 12 l. 17-23.

110.  On February 20, 2014, both Fisher and the security office were aware that Ausley was scheming to manipulate his housing status in order to obtain a permanent Z code.  Exhibit G, pp. 15-16.

### SCI-Smithfield's Initial Reception Committee (IRC)

111.  The IRC's duties are set forth in Procedures Manual 11.2.1 (Exhibit A-1) and in local SCI-Smithfield Policy 11.2.1 SMI. (Exhibit B-1).

112.   At the time that Brian Lightner made a decision on where to house Coleman, Ausley was a general population, Custody Level 3 inmate, with no history of assaulting prior cellmates, and no history of misconducts related to violence in prison.  Exhibit A, ¶ 106.

113.  Given that Ausley's unit management staff had reviewed Ausley's Z-Code request, and there were no psychological or security concerns which warranted a Z-Code, the Ausley had been pre-screened for double-celling suitability.  It had

been pre-determined that there were no known dangers in placing a cellmate in the cell with Ausley.  Exhibit A, ¶ 107.

114.  Lightner  assigned Coleman to a cell on the reception block at SCI-Smithfield, which is typically a temporary housing assignment.  Exhibit A, ¶ 108.

115.    The IRC identified Coleman's celling preferences, and provided Coleman with a double-celling orientation to advise him to immediately inform a block officer  or staff member if any difficulties arise out of double celling.   Exhibit A, ¶ 110; Exhibit A-10.

### *Material Facts regarding the role of Brian Lightner on IRC*

116.   As the Corrections Vocation Coordinator on the IRC, Lightner's responsibilities included explaining the double celling policy and obtaining an inmates celling preferences, and making an initial cell assignment on the reception block.  Exhibit B, ¶ 4.

117.   Included in the explanation  the double celling policy were an explanation of the conditions applying to double-celling, procedures to request termination of double-celling, as well as instruction to the inmates to inform staff of any problems that arise from double celling.  See  Exhibit A-1, 11.2.1, Section 5A.; Exhibit B, ¶ 5.

118.   Prior to each time the IRC met, Lightner would review the empty beds on the reception block at SCI-Smithfield, KA1, where all incoming  general population inmates were temporarily housed after meeting with the IRC.  Exhibit B. ¶ 6.

119.  Lightner would make sure there were no inmates with a Z-Code, or other housing restriction in a double cell.  Exhibit B, ¶ 7.

120.  Lightner would review the information pertaining to the inmates who were in a cell that contained an empty bed, and if he had any questions or concerns, he would call the counselor or unit manager before assigning that inmate a cell mate. Exhibit B, ¶ 8.

121.  Lightner reviewed Coleman's celling preferences with him at the IRC meeting.  Exhibit B-2.

122.  Lightner placed Coleman in an available bed on the reception block in a cell inhabited by Gary Ausley, who was a general population inmate at the time who did not carry a Z-Code.  Exhibit B, ¶ 15.

123.  Given the fact that Ausley did not have a Z-Code, and knowing that inmates in the Department of Corrections who staff have determined are a danger to potential cell-mates receive Z-Codes,   Lightner would have concluded that Ausley

had been prescreened for double-celling, and that it had been determined that Ausley was not a danger to a potential cell-mate. Exhibit B, ¶ 16

124.  In drawing that conclusion, Lightner would have relied in part on the processes in place, and the conclusions of Department of Corrections employees who have evaluated Ausley during the time period he has been incarcerated.  Exhibit B, ¶ 16.

*Material Facts Regarding the Role of Christian Garman on IRC and as Unit Manager*

125.  Garman was a Unit Manager at SCI-Smithfield, whose duties as Unit Manager involved sitting on the Initial Review Committee (IRC) to help conduct initial reception interviews of inmates on the day of their arrival at SCI-Smithfield. Exhibit E, ¶ 2.

126.    As the Unit Manager on IRC, Garmin's responsibilities included chairing the committee, informing the inmate of the purpose of the IRC, summarizing the orientation activities, and reviewing the transfer rationale with the inmate.  Exhibit E, ¶ 4; Exhibit B-1, p. 5.

127.  Garmin would reviewed the security threat group security questionnaire and go over phone list and visiting list information with the inmate, provide the inmate with a copy of the inmate handbook, and the facility supplement to the handbook.

128.   It was not part of Garman's function on the IRC to assign the inmate a cell, or match potential cellmates.  Exhibit E, ¶ 7.

129.   Garman was not involved in any way with the decision to place Coleman in a cell on KB-1 block with Inmate Ausley.  Exhibit E, ¶ 8; Exhibit B-1, p. 6.

130.   On March 6, 2014, Garman worked the 7 am to 330 pm shift.  Exhibit E, ¶ 9.

131.   Garman had no contact with Coleman after the IRC meeting. Exhibit E, ¶ 10.

132.   When Garman left work after his shift at 3:30 pm on March 6, he was not aware of any problems resulting from double celling Coleman on KB-1 block. Exhibit E, ¶ 11.

*Material Facts Regarding the Role of Candace Snyder on IRC*

133.   On March 6, 20014, Snyder was a Corrections Counselor at SCI-Smithfield assigned to the IRC. Exhibit F, ¶¶ 1-2

134.   As the counselor/case manager on the IRC Synder's responsibilities included reviewing the inmate's information on the DOCnet computer system, assessing the need for special housing status, separations, psychological or psychiatric concerns, making referrals when appropriate, and documenting the

inmate's interview on the "Cumulative Adjustment Record" (DC-14).  Exhibit F, ¶ 4; Exhibit B-1, p. 6; Exhibit B-2.

135.   It was not part of Snyder's function on the IRC to assign the inmate a cell, or match potential cellmates.  Exhibit F, ¶ 7; Exhibit B-1, p. 6.

136.   Snyder did not have any input on cell assignment for an incoming inmate in any way. Exhibit F, ¶ 8.

137.   Snyder was not involved in any way with the decision to place Coleman in a cell on KB-1 block with Inmate Ausley.  Exhibit F, ¶ 8.

*Material Facts Regarding the Role of Lt. John Peck on IRC*

138.  On March 6, 20014, Peck was a Corrections Officer 3 at SCI-Smithfield whose duties involved sitting on the Initial Review Committee (IRC) to help conduct initial reception interviews of inmates on the day of their arrival at SCI-Smithfield. Exhibit H, ¶¶ 1-2.

139.  As the commissioned officer on IRC, Peck's duties included completing the Confidential Reception Interview Sheet, reviewing the inmate's conduct record, and summarizing the behavior expectations at the facility.  Exhibit H, ¶ 4; Exhibit B-1, p. 6.

140.   It was not part of Peck's function on the IRC to assign the inmate a cell, or match potential cellmates.    Exhibit H, ¶ 6.

141.   Peck did not have any input on cell assignment for an incoming inmate in any way.  Exhibit H, ¶ 7.

142.   Peck was not involved in any way with the decision to place Coleman in a cell on KB-1 block with Inmate Ausley.  Exhibit H, ¶ 8.

### *Material Facts Regarding the Role of Counselor Deborah Patton*

143.   During the time period relevant to this case, Patton was employed by the Pennsylvania Department of Corrections a Correctional Counselor at SCI-Smithfield.   Exhibit D, ¶ 1.

144.   Patton was not part of the Initial Reception Committee, and did not play any role whatsoever in assigning Coleman a cell after his reception at SCI-Smithfield.  Exhibt D, ¶ 2.

145.   Although IRC assigned Patton as Coleman's counselor, Patton had no contact with him on March 6, 2014.  Exhibit D, ¶ 3.

146.   On March 6, 2014, Patton worked from 8 am – 4:30 pm, and was primarily assigned to F block and half of G block.   Exhibit D, ¶ 4,

147.   During Patton's shift, she had no contact with Coleman, and was not aware of any issues related to his double celling.

148.  The first time Patton became aware of anything related to the allegations in this case was when I met with Coleman after he had reported he had been sexually assaulted.  Exhibit D, ¶ 7.

### B. Undisputed Material Facts Regarding the night of March 6, 2014

149.  Coleman arrived at SCI-Smithfield on March 6, 2014.  Exhibit I, Deposition, p. 25, l. 1.

150.  Upon his arrival at SCI-Smithfield, Coleman went to reception and met with the Initial Reception Committee.  Exhibit I, Deposition p. 25

151.  Coleman left the reception area at approximately 2:00 PM.  Exhibit I, Deposition p. 28, l. 25.

152.  From the reception area, Coleman went to K block with the other inmates at reception, where he sat at a table. Exhibit I, Deposition p. 29, l. 3-21.

153.  Coleman was eventually told to go to cell 44. Exhibit I, Deposition p. 30-31.

154.  When Coleman arrived at cell 44, Ausley related that he did not want Coleman in the cell, and told Coleman that he needed to find somewhere else to go. Exhibit I, Deposition p. 32, l. 7-9, p. 33 l. 10-13.

155.  Ausley directed Coleman to ask a CO to get him out of the cell. Exhibit I, Deposition p . 34 l. 17-20.

156.  Ausley wrote down a script for Coleman to say to get removed from the cell, and Coleman read the script to the COs over the intercom. Exhibit I, Deposition p . 34 l. 23 – p. 35 l. 1-12.

157. Coleman was pressing the button on or around 10:00 PM. Exhibit I, Deposition p. 42, 43, 1-6

158.  Although Coleman alleged Ausley threatened him, Coleman could not recall at his deposition what Ausley said to him that Coleman perceived as a threat. Exhibit I, Deposition p P. 34, l. 4-12.  Coleman testified that he felt threatened because Ausley was loud and looking at him aggressively. Exhibit I, Deposition p p. 48 l. 18-25.

159.  Ausley did not threaten to kill or rape Coleman at the time Coleman was pressing the intercom button and communicating with the officers.  Exhibit I, Deposition p . 41, l. 6-25; p. 42 l. 1-4.

160.  Coleman did not tell the officers that he had been threatened.  Exhibit I, Deposition p. 37, l. 11-15.

161.    At the time Coleman was pressing the intercom button and communicating with the officer, Ausley had not said anything to lead Coleman to believe he would be sexually assaulted. Exhibit I, Deposition p. 39, l. 13-17.

162.  On March 6, 2014, Officers Scott and Walters worked the 10 PM to 6 AM shift at SCI-Smithfield, as corrections officers assigned to K Block.  Exhibit L, ¶ 2.; Exhibit M, ¶ 2.

163.  As Officer Scott was doing security rounds on K Block at SCI-Smithfield, Mr. Coleman stopped him at his cell. Exhibit L, ¶ 4.

164.  Coleman informed Scott that Coleman needed out of the cell, but would provide no further explanation.  Exhibit L, ¶¶ 5-6.

165.  Scott asked Coleman whether or not he was being harassed, threatened or assaulted.   Coleman told him no.  Exhibit L, ¶ 6; Exhibit I, Deposition p. 37, l. 11-15.

166.  Scott did not perceive Coleman to be scared or in distress.  Exhibit L, ¶ 7.

167.  Scott informed Coleman that he would notify the Shift Commander of the situation, and Scott immediately contacted the acting shift commander, Lt. Heater.  Exhibit L, ¶ 7. Exhibit K, ¶ 2.

168.  Coleman's cell had an intercom, where Coleman could communicate with the officer in the bubble.   Exhibit L, ¶ 11.

169.  The intercom allowed the bubble officer to also listen in on Coleman's cell without Coleman's knowledge.  Exhibit L, ¶ 12.

170.  Officer Scott had the intercom immediately turned on so the officers could monitor the inmates in the cell to assess the gravity of the situation.  Exhibit L, ¶ 13.

171.  Scott heard inmate Ausley and Coleman talking and trying to come up with a way for Coleman to be removed from the cell. Exhibit L, ¶ 15.

172.   Officers Scott and Walters heard Coleman and Ausley laughing and joking in the cell on and off for hours, but the laughing and joking stopped when one of the officers came to the door, and then resumed after the officer would leave the door.  Exhibit L, ¶ 17; Exhibit M, ¶ 8.

173.  At no time did Scott hear threats or trouble coming from the cell.  Exhibit L, ¶ 18.

174.  On Walters' security round at around 12:20 AM, Mr. Coleman was standing at his door and told Walters "Hey, CO, I need to get out of this cell." Exhibit M, ¶¶ 2-4.

175.   Walters asked Coleman why he needed to get out, and Coleman would not answer.  Exhibit M. ¶ 5.

176.  Walters asked Coleman three times in three different ways, "What happened?  Why do you need out of your cell? What is going on?," and Coleman would say nothing.  Exhibit M. ¶ 6.

177.   During his shift on March 6, 2014, Lt. Heaster, the shift commander, was informed by the officers on K block, that one of the inmates wanted to be removed from his cell.  Exhibit K, ¶ 3.

178.   Heaster asked why the inmate wanted out of his cell, and the officers advised Heaster that the inmate would not provide any reason.  The officers told Heaster that inmate only would say that he wanted moved.  Exhibit K, ¶ 4.

179.   Heaster sent Sgt. Shirey to talk to the inmate, Mr. Coleman. Exhibit L, ¶ 10.

180.   Sgt. Shirey and Officer Walters responded to Coleman's cell.  Exhibit I, Deposition p P. 44, l 21-25; Exhibit M, ¶ 7.

181.   Coleman told Shirey that he wanted out of the cell, but would not tell Shirey why. Exhibit J, ¶ 8.

182.  At the time Shirey responded to Coleman's cell, Ausley had not made any sexual overtures towards Coleman. Exhibit I, Deposition p. 50, l. 17-20.

183.  Shirey specifically asked Coleman whether he had been assaulted or threatened by his cellmate, and Coleman responded that he had not. Exhibit I, Deposition p. 45, l. 16-20;  Exhibit J, ¶ 9.

184.  Shirey also observed Coleman's demeanor, and perceived him to seemed calm, and not scared.  Exhibit J, ¶ 10.

185.  Coleman never complained to Shirey that he was in fear.  Exhibit J, ¶ 11.

186.  Based on the information Shirey received from the officers regarding what they heard over the intercom, based on Coleman's affirmative representation that he had not been assaulted or threatened, and based on Coleman's demeanor at the time, Shirey made a judgment that Coleman was not in any immediate danger, and there was not a need to move him immediately.   Exhibit J, ¶ 12.

187.  After Shirey left the cell, Coleman did not press in intercom button again.  Exhibit I, Deposition p. 51, l. 13-15.

188.  Shirey relayed the contents of his conversation, his observations, and the information Shirey received from the other officers to the Shift Commander, Lt. Heaster.  Exhibit J, ¶ 13; Exhibit K, ¶P 6.-8..

189.  Shirey told Heaster that he had asked the inmate specifically if he had been threatened or assaulted and the inmate said no.  Exhibit K, ¶ 6.

190.  Shirey told Heaster that Coleman would only say he wanted moved, and would not provide an explanation.  Exhibit K ¶ 7.

191.  Shirey told Heaster that Coleman did not seem frightened.  Exhibit K, ¶ 8.

192.  Heaster also talked to Officer Scott on the block who had been listening on the intercom to the two inmates' interactions. Exhibit L, ¶ 20; Exhibit K, ¶ 9.

193.  Scott told Heaster that they heard the inmates discussing ways to get out of their cell and what to say to get out of the cell, and joking with each other. Exhibit K, ¶ 10; Exhibit , ¶ 20

194.  Based on the information Heaster received, including the assessment of Sgt. Shirey and the officers on the block, Heaster determined that there was no serious risk of harm in allowing the two inmates to continue to cell together. Exhibit K, ¶ 11.

195.  Officer M. McConaughney worked the 2 PM to 10 PM shift on the RHU side of K Block only, which was not the area where Coleman and Ausley were housed.  Exhibit W p. 3, No. 4.

196.   McConaughey had no contact or communication with Coleman on the night in question.  Exhibit W, p. 3, No. 2.

197.   Officer C. Jones worked the 2 pm – 10 pm shift as the KB 1 wing officer.  Exhibit V, p. 3, No. 4.

198.   Jones had no contact or communication with Coleman on the night in question which involved Coleman complaining that he wanted out of his cell.  Exhibit V, p. 4, No. 9.

199.  T. Myers worked the 2 PM to 10 PM shift as an officer on K Block.  Exhibit U, p. 3., No. 4.

200.  Myers never interacted with Plaintiff on March 6, 2014.  Exhibit U, p. 4, ¶ 9.

201.  Officer Glass worked the 2 PM to 10 PM shift on the RHU side of K Block only, which was not the area where Coleman and Ausley were housed.  Exhibit T p. 4, No. 4.

202.  Glass had no contact with Coleman or Ausley on March 6, 2014,  Exhibit T, p. 5, Nos. 9 and 10.

203.  Officer Rinehart worked the 2 PM to 10 PM shift on the RHU side of K Block only, which was not the area where Coleman and Ausley were housed.  Exhibit T p. 3, No. 4.

204. Rinehart had no contact with Coleman or Ausley on March 6, 2014, Exhibit S, p. 4, Nos. 9 and 10.

205.   On March 6, 2014, Nickum worked the 10 PM to 6 AM shift at SCI-Smithfield, as a Corrections Officer assigned to K Block.   Exhibit N, ¶ 1.

206.   Nickum had no direct communication with either Coleman or Ausley on the night in question.  Exhibit N, ¶ 10.

### C. Undisputed Material Facts Related to DOC Training

207.  The Department of Corrections training requirements and procedures are set for in Policy 5.1.1, which is available on the Department Of Corrections public website, www.cor.pa.gov.   Exhibit O, ¶ 4.

208.   Specifics regarding training related to sexual assault prevention are contained in DC-ADM-008, Section 2.B.  Exhibit O-8.

209.    Each new full-time DOC employee must successfully complete orientation and Basic Training to maintain employment.  Exhibit O, ¶ 5.

210.  At the time of the incidents described in the complaint, new employees who were to have contact with inmates (contact employees) were required to receive a minimum 120 hours of training as part of basic training.  Exhibit O, ¶ 7.

211.   At the time of the incidents described in the complaint, contact employees who were also corrections officer trainees were required to receive a minimum of 160 hours of training as part of basic training.  Exhibit O, ¶ 8.

212.   If a DOC contact employee was hired in 2009 or later, that employee took a Prison Rape Elimination course at part of basic training. Exhibit O, ¶ 9.

213.  Exhibits O-1 and O-2 list the objectives of the Prison Rape Elimination Course which was mandatory for all participants to take.  Exhibit O, ¶ 12.

214.   According to the Basic Training Program Course Approval Packet, effective September 2009, and effective December 2013, the Prison Rape Elimination Course was 2 hours long.  Exhibit O-1; Exhibit O-2.

215.   The performance objectives of the Prison Rape Elimination Course included training on the characteristics of likely victims and perpetrators.  Exhibit O-1, p. 4; O-2, p. 4; Exhibit O, ¶ 14.

216.  DC-ADM-008, was also reviewed as part of the training objectives. Exhibits O-1, p. 4; O-2, p. 4;

217.  DC-ADM-008, Section 6 informed staff of facts related to inmate on inmate sexual assault, including Characteristics of a Sexually Aggressive Inmate, and Characteristics of a Potential Victim.  Exhibit O-8, p. 27, DC-ADM 008-Section 6 A.

218.   In addition to the Training Academy, every Department of Corrections employee has mandatory in-service training.  Exhibit O, ¶ 17.

219.   During that time from November 22, 2012-April 30, 2014, contact employees (those who have contact with inmates) of the Department of Corrections

were required to take update classes on prison rape elimination and a computer simulation once every three years  Exhibit O-6; Exhibit O ¶¶ 17-20.

220.   Exhibit O-3 is a true and correct copy of the Prison Rape Elimination training for basic training that was used for basic training starting in December 2008, and was revised for use in in-service training in December 2013.  Exhibit O, ¶ 21.

221.  The training in Exhibit O-3 included training on predictors that escalate the likelihood of being a victim of sexual assault.  *See* Exhibit O-3 pp. 35-40[1].

222.  The training in Exhibit O-3 included training on characteristics of likely predators.  Exhibit O-3, p. 42.

223.  The training in Exhibit O-3 also included training on prevention and intervention in sexual assaults.  Exhibit O-3, pp. 47-49

224.  The PREA lesson plan for basic training which was in place from December 2013 through 2014 went over both common characteristics of a victim and common characteristics of a perpetrator, and methods for inmates to report sexual abuse.  Exhibit O-4; Exhibit O, ¶¶ 25-27.

225.  From 2008-December 2013, contact staff took a web based training, and simulation to fulfill the requirement for Prison Rape Elimination in service training.  Exhibit O, ¶ 29-30; Exhibit O-7

---

[1] The page numbers refer to the pages of the .pdf document filed in the Court's electronic filing system.

226.  Exhibit 0-7 is a simulator user guide for the Prison Rape Elimination in-service training.  This simulation, referred to in Exhibit 0-6, was use from after 2008 through December 2013, as part of a web based training presented to contact staff during the in-service training,

227.   The objectives of the Prison Rape Elimination Simulation included include identifying the physical, behavioral, and emotional characteristics of potential victims or perpetrators through questioning and observation; demonstrating proper process and procedure in response to a potential situation of sexual assault, and demonstrating professionalism and ethics when interviewing and handling potential victims and the information they confide. Exhibit  O-7, p. 22

228.  The simulation also included information on cell assignments.  See e.g. Exhibit O-7 p. 27-28.

229.   The computer module was replaced by Exhibit O-4 for in service training in December 2013. Exhibit O, ¶¶ 29-31.

*Material Facts Related to Mandy Biser's role in training*

230.   Mandy Biser-Sipple was the Corrections Classification and Program Manager (CCPM) at   SCI-Smithfield from 2010 to January of 2017.   Exhibit P.  p. 12, l. 12-25, p. 16, 18

231.  In 2014, the Department of Corrections updated its policies to become compliant with PREA.  Exhibit P, pp. 27-28.

232.  As a result, and beginning in 2014, part of Biser's duties as the CCPM included PREA compliance and training.  Exhibit P, p. 13, p. 17-25; p. 14, 1-7.

233.   From January 30-31, 2014, Biser Sipple was trained on her duties as PREA compliance manager, including PREA and the policy and guidelines.  Exhibit P.  p. 14, l. 21-24, p. 22; p. 24 7-12

234.  On or about February 21, 2014, Biser-Sipple conducted a train the trainer course.  Exhibit P. 22, l. 13-20., p. 25, 18-21. ;Exhibit P-1.  The train the trainer course was to familiarize staff with the new changes to DC-ADM-008.  Exhibit P. pp. 81-84.

235.  The training instructed staff on PREA, on common characteristics of a victim, behavioral changes in a victim, physical signs of victimization, emotional signs of victimization, common characteristics of a perpetrator, and inmate reporting methods for sexual abuse, and staff responsibilities for receiving reports of sexual abuse/harassment..  Exhibit P-2. pp 20-24; pp. 36-38.

236.  SCI-Smithfield had its first PREA Compliance Audit from August 3-5, 2015.  Exhibit P, pp. 98-99.

237.   The purpose of the audit was to see if SCI-Smithfield was compliant with the national PREA standards. Exhibit p. P-99

238.   The audit found that, at least as of August 2015, SCI-Smithfield was compliant with every applicable PREA standard, and exceeded four of those standards.  Exhibit P-3, p. 6.

239.  The Department of Corrections PREA reports from 2013 and 2014 show that during those years, the Department of Corrections was in the process of developing a PREA-specific risk assessment tool that the SCI-Smithfield audit states was implemented in March of 2015.  Exhibit P-4, p. 8, p. 17; Exhibit P-3, p. 28.

### _Material Facts Regarding the Role of Superintendent John Fisher in Training_

240.  The training requirements in the Department of Corrections are set forth at a statewide level by policy 5.1.1, which is available on the Department Of Corrections public website, www.cor.pa.gov.   Exhibit O, ¶ 4.

241. Superintendent Fisher had no input on the content of any of the training that occurred at SCI-Smithfield.  Exhibit X, Deposition, p 23, l. 16-19.

242.  Fisher was never asked to approve training at SCI-Smithfield.  Exhibit X, p. 24 P. 24, l. 1-3.

243.   While Fisher, as Superintendent, was responsible for the overall operation of the prison, each prison had a training coordinator who would oversee the training at the prison, log the training required by Policy 5.1.1, schedule it, and make sure it was completed.  *Id.*, p. 21, l. 13-17.

*Undisputed Material Facts Regarding the Role of Secretary Wetzel in Training*

244.  Secretary Wetzel did not become Secretary of the Pennsylvania Department of Corrections until 2011.  Exhibit Q, p. 8, n. 15.

245.  Secretary Wetzel does not participate in, or personally supervise trainings.  Exhibit Q, p. 6, No. 10

246.  Secretary Wetzel delegates training to the Department of Corrections Training Academy Staff and the training coordinators at each of the institutions. Exhibit Q, p. 6, No. 10

Respectfully submitted,

Office of General Counsel

By:   /s/ Jeffrey M. Paladina
      Jeffrey M. Paladina
      Assistant Counsel
      Attorney I.D. No. PA81542
      PA Department of Corrections
      1920 Technology Parkway
      Mechanicsburg, PA 17050

                                                    (717) 728-7763
                                                    Email: jpaladina@pa.gov
Dated:  September 14, 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DARREN D. COLEMAN,                      :
                                        :   Civil Action No. 15-cv-00847
            Plaintiff,                  :
                                        :
      v.                                :
                                        :
                                        :
JOHN E. WETZEL, et al.,                 :
                                        :
            Defendants.                 :   JURY TRIAL DEMANDED

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a true and correct copy of the foregoing ***Defendants' Motion for Permission to Exceed the Page Limitation of Local Rule 7.8(b)*** upon the person(s) and in the manner indicated below.

Service via ECF addressed as follows:

James Davy, Esquire                     Marianne Sawicki, Esquire
The PA Institutional Law Project        Law Office of Marianne Sawicki
718 Arch Street                         2530 South Blair Avenue
Suite 304 S                             Huntingdon, PA 16652
Philadelphia, PA 19106

                    Riley H. Ross, III. Esquire
                    Ross Legal Practice, LLC
                    Two Penn Center
                    1500 JFK Blvd.
                    Ste 1525
                    Philadelphia, PA 19102

                                        /s/ Shelly Holley
                                        Shelly R. Holley
                                        Legal Assistant
                                        Office of Chief Counsel
                                        Department of Corrections
                                        1920 Technology Parkway
                                        Mechanicsburg, PA   17050

Dated:  September 14, 2018