IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARREN D. COLEMAN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN E. WETZEL, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:15-CV-847<br><br>Chief Judge Conner<br><br>Magistrate Judge Mehalchick |

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS**

With Respect to Darren Coleman

1. Darren Coleman's diagnostic assessment by the Department of Corrections documents him having an IQ of 66 and reading at a 4th grade level, with an intellectual rating of "extremely low." Ex. A.

2. Darren Coleman's diagnostic assessment by the Department of Corrections documents him, at the time of the events giving rise to this suit, standing 5'9" and weighing 162 lbs.

3. Darren Coleman's diagnostic assessment by the Department of Corrections documents him as having no potential for violence.

4. Darren Coleman's criminal history includes solely alcohol-related DUI offenses.

5. At the time Darren Coleman was incarcerated in January 2014, he was 46 years old.

1

With Respect to Gary Ausley

6. At the time of the events giving rise to this lawsuit, Gary Ausley stood 6'2" tall and weighed 240 pounds. Ex. A.

7. Gary Ausley was serving a 15-30 year sentence for third-degree murder, robbery to inflict serious bodily injury, criminal conspiracy, and receiving stolen property. Defs' Ex. A.

8. The underlying offense was murdering a prostitute in connection with a sexual encounter.

9. At the time of the events giving rise to the lawsuit, Gary Ausley was a documented member of a security threat group at SCI-Smithfield—the "Gorilla Stone" set of the Bloods gang. Ex. S, pg. 5-6.

10. At the time of the events giving rise to the lawsuit, Gary Ausley had an IQ documented by the Department of Corrections as 99.

11. Prior to the events giving rise to the lawsuit, Gary Ausley had received several misconducts of various types. Ex. Q.

12. One of those misconducts, on 5/21/12 was for refusing an order to take a cellmate. Ex. Q.

13. Another of those misconducts, on 11/18/13—less than four months before Darren Coleman was assigned to cell with him—was for "Threatening Another Person." Defs' Ex. A-5; Defs' Ex. A-9.

14. This stemmed from Gary Ausley writing to staff that "I need my own space and it will happen one way or the other." Defs' Ex. A-5; Defs' Ex. A-9; Ex. R.

15. Staff viewed this as a threat toward future cellmates. Ex. R.

16. On 10/03/13, Gary Ausley wrote to staff that "I felt the strong need to kill my last cellmate." Ex. A; Ex. R.

With Respect to the Inmate Reception Committee "IRC"

17. Upon his arrival to SCI-Smithfield, Darren Coleman met with an IRC consisting of Defendants Lightner, Synder, Garman, and Peck.

18. The purpose of the IRC includes assessing security concerns of prisoners arriving at the institution. *E.g.* Ex. C, pg. 13-14.

19. Prior to the IRC meeting with Coleman, Defendant Lightner had made a pre-assignment that Coleman would cell with Gary Ausley. Ex. C, pg. 16; Ex. T, pg. 36.

20. Defendant Lightner's job at the time was as a vocational coordinator. Ex. C, pg. 7.

21. The job description for Defendant Lightner's position does not involve making cellmate assignments. Ex. V.

22. The IRC regularly collaborated on cellmate assignments.

23. The IRC regularly changes cell assignments from the initial recommendation made by Defendant Lightner. Ex. T, pg. 36.

24. Defendant Garman testified at his deposition that "I just participated in the decision-making process. Sometimes we relied on each other's experience and knowledge, and if we see something that a person might can't answer it easily you know, then we might brainstorm together." Ex. T, pg. 16.

25. The IRC, having met with Darren Coleman, did not change his cell assignment.

26. Brian Lightner had access to full files of inmates for whom he considered cellmate pairings, and assessed that information. *See* Ex. C, pg. 25.

27. In making pairings, he reviewed those files, but ultimately considered only whether an inmate had a Z-code. *E.g.* Ex. L, pg. 21-22.

28. A Z-code is a designation assigned to inmates who SCI-Smithfield and the DOC have determined should not share a cell with anyone. *E.g.* Ex. T, pg. 34.

29. Not every inmate who poses a threat to other inmates—including some inmates who have a history of assault—gets a Z-code.

30. Besides looking for a Z-code, Defendant Lightner did not have a process for assessing an imbalance of power between in the incoming inmate and the existing Smithfield resident to whom he was going to pair the incoming inmate. Ex. C, pg. 16.

31. Besides looking for a Z-code, the rest of the IRC did not consider a real or potential imbalance of power, either. *Id*.

32. All IRC members, nevertheless, knew that characteristics such as age; physical size; history of violence; intellectual ability; experience with incarceration; and security threat group status, could affect the balance of power between two cellmates. Defs' Ex. A-1; Defs' Ex. B-1, Ex. Y.

33. Policy 11.2.1 – the Reception and Classification Procedures Manual – instructs staff to review inmates' records to determine whether there is an imbalance of power that could lead to victimization of the weaker inmate. Defs' Ex. A-1; Defs' Ex. B-1.

34. Some Defendants have since acknowledged that Coleman and Ausley should not have been celled together at all. *See*, *e.g.*, Ex. T, pg. 61; Ex. C, pg. 50; *see also* Ex. L, pg. 60 ("Things like that can suggest an imbalance of power.").

With Respect to the Night of March 6, 2014

35. Gary Ausley told staff he did not want Coleman in his cell from the moment Coleman arrived. Dkt. 77, ¶ 154.

36. Gary Ausley told Coleman that he was in for murder, in an attempt to intimidate him. Ex. B., pg. 90-92.

37. Gary Ausley told Coleman he had to get himself out of the cell. *See id*.

38. Coleman initially tried to express his concerns to correctional officers Scott, Walters, and Nickum during tier checks on their shift. Ex. B, pg. 34-35.

4

39. Although Nickum knew that an inmate trying to report a threat about a cellmate is less likely to if he's in the cell with the cellmate, he did not remove him from the cell to talk. Ex. I, pg. 16-19; Ex. B, pg. 34-35.

40. Although Scott knew that an inmate trying to report a threat about a cellmate is less likely to if he's in the cell with the cellmate, he did not remove him from the cell to talk. Ex. H, pg. 19.

41. Scott acknowledged that when an inmate is in his cell, "I wouldn't expect them to say that they feel threatened when I'm doing a tier check, but if anybody has a problem, they would say, hey, I need to talk to somebody." Ex. H, pg. 23.

42. Coleman told Defendant Walters that he needed to get out of the cell "probably about four times." Ex. J, pg. 33.

43. While listening to Coleman and Ausley on the intercom, Defendants Scott, Nickum, and Walters heard Ausley manipulating Coleman and telling him what to do and say. *See* Ex. H, pg. 41-42; *see* Ex. I, pg. 47-48; *see* Ex. J, pg. 37.

44. Such manipulation is a sign of an imbalance of power, and a sign of concern for experienced correctional staff. Ex. A, pg. 21.

45. Defendants acknowledge that laughter, which they purported to hear, may often be a sign of discomfort on the part of the laugher. *E.g.* Ex. I, pg. 72.

46. Defendants Scott, Nickum, and Walters reported their interactions with Coleman to Sgt. Shirey. *E.g.* Ex. H, pg. 17

47. While doing so, they told him they regarded the matter as posing no issue. *Id*.

48. Shirey similarly downplayed the issue when he reported it to Shift Commander Defendant Heaster. Ex. H, pg. 45.

49. Defendant Heaster, once informed of the situation, nevertheless made no other investigation of his own. Ex. H, pg. 31-32.

50. Among the factors that Scott, Nickum, Walters, Shirey, and Heaster used in assessing the situation was the limited bed space in the facility.[1]

51. Defendant Nickum does not believe that in his 17 years as a corrections officer, *any* inmates have felt at risk of sexual violence. Ex. I, pg. 31.

52. Defendant Walters testified that he would only recommend separating two cellmates in the event of a cell fight or a potential suicide. Ex. J, pg. 25.

53. Darren Coleman was sexually assaulted by Gary Ausley the night of March 6, 2014. Ex. B, pg. 52-57.

54. As part of that assault, Ausley forced Coleman to perform oral sex on him, and then ejaculated on him. *Id*.

55. Coleman continues to suffer mentally and emotionally as the victim of a sexual assault. *Id*.

With Respect to the Investigation that Ensued

56. Darren Coleman informed staff that he had been assaulted the morning of March 7, 2014. Ex. B, pg. 55.

57. He did this in the dayroom, away from the cell he shared with Gary Ausley. *Id*.

58. Darren Coleman told the staff that Ausley forced him to perform oral sex, and that Ausley ejaculated on him.

59. 

60. Darren Coleman told an investigator that he had told Sgt. Shirey the night before that he was afraid of Ausley. *Id.*

---

[1] *See* Ex. H, PG. 29 ("[I]f I – I can think that he might hurt somebody, but there's nothing – if that's my only bed, I have to put somebody in there."); *see also* Ex. I, pg. 32. And that factor impacted their decision that night. *See also* Ex. G, pg. 41 ("[T]here's limited space on that – on that block.").

61. █████████████████████████████████████████

62. █████████████████████████████████████████

63. The correctional officers present that night—Nickum, Scott, and Walters—were never interviewed as part of any investigation, either internal ████ ████ *See* Ex. I, pg. 52, *see also* Ex. H, PG. 61-62, 67 *see also* Ex. J, pg. 43.

64. Darren Coleman eventually returned to general population—at his own request.

65. █████████████████████████████████████████

66. █████████████████████████████████████████

67. █████████████████████████████████████████

68. Neither Gary Ausley's prison records nor any Defendant or deponent identified ████████████████████████████

With Respect to Training

69. At the time of the events giving rise to this lawsuit, the DOC policy DC-ADM-008 covered the dangers of inmate-on-inmate sexual assaults. Defs' Ex. O-8.

70. Despite this, it did not provide any instruction on how to make cell assignments that addressed the risk of those dangers. *Id.*

7

71. There was no centralized supervision of anyone in DOC facilities making cell assignments, including to ensure that their personal implementation of DC-ADM-008 protected prisoners in DOC custody at risk of sexual violence. *Id.*

72. None of the IRC Defendants—Lightner, Synder, Peck, or Garman—were eve disciplined for failing to implement cell assignment policies that protected inmates, despite knowing the risks of sexual violence outlined in the DC-ADM-008 policy. *See, e.g.*, Ex. T, pg. 11.

73. At the time of the events giving rise to this lawsuit, Defendant Fisher had responsibility for training SCI-Smithfield staff. Ex. K, pg. 21.

74. Defendant Fisher never implemented a particular policy with respect to cell assignment procedures to comply with the DC-ADM-008 policy.



75. 

76. 

77. 

78. Defendant Biser also never implemented a policy with respect to cell assignment procedures that would have complied with the DC-ADM-008 policy. *See generally* Ex. E.

79. At the time of the events giving rise to this lawsuit, the DOC used a screening tool called the Pennsylvania Additive Classification Tool ("PACT") to assess risk of victimization.

80. In 2015, the Department switched to a new tool, called the prison risk assessment tool ("PRAT"). Ex. Z.

81. The PACT was not compliant with the federal Prison Rape Elimination Act ("PREA"). *See generally* Ex. A.

82. The PRAT was compliant with PREA. Ex. A, pg. 21.

83. In the wake of switching the PRAT, the staff at SCI-Smithfield ran the diagnostic tool on all the inmates. Ex. L, pg. 43; *see also* Ex. A, pg. 21.

84. Under the new tool, staff changed some number of inmate pairings that had been made using the PACT because the PRAT identified them at placing one of the inmates in the pairing at an unacceptable risk of victimization. Ex. L, pg. 43.

Respectfully submitted,

/s/ Riley H. Ross III
Attorney ID: PA 204676
Mincey Fitzpatrick Ross
Two Penn Center
1500 JFK Blvd. Suite 1525
Philadelphia, PA 19102
(215) 587-0006 (office)
(215) 703-8480 (cell)
(215) 587-0628 (fax)
riley@minceyfitzross.com

/s/ Jim Davy
Attorney ID:  PA 321631
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
T:  215-925-2966
jdavy@pailp.org

Dated: December 14, 2018

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARREN D. COLEMAN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JOHN E. WETZEL, *et al.*,<br><br>　　　　Defendants. | Case No. 1:15-CV-847<br><br>Chief Judge Conner<br><br>Magistrate Judge Mehalchick |

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiff's Statement of Material Facts filed by Jim Davy was served upon the following via ECF on December 14, 2018:

> Jeffrey M. Paladina
> Chief Counsel's Office
> Pennsylvania Department of Corrections
> 1920 Technology Parkway
> Mechanicsburg, PA 17050
> Tel: 717-728-7763
> Email: jpaladina@pa.gov

> 　　　/s/ Jim Davy
> 　　　Attorney ID: PA 321631
> 　　　Pennsylvania Institutional Law Project
> 　　　718 Arch Street, Suite 304 South
> 　　　Philadelphia, PA 19106

T: 215-925-2966
jdavy@pailp.org