# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

DARREN DARNELL COLEMAN,

                  Plaintiff,

    v.

JOHN E. WETZEL, et al.,

                  Defendants.

CIVIL ACTION NO. 1:15-CV-00847

(CONNER, C.J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

On April 30, 2015, Plaintiff Darren Darnell Coleman ("Coleman"), appearing through counsel, initiated this civil rights action by filing a fee-paid Complaint. (Doc. 1). The Second Amended Complaint, which stands as the operative pleading in this matter, alleges federal civil rights claims pursuant to 42 U.S.C. § 1983 against the following Pennsylvania Department of Corrections ("DOC") employees and officials: John Wetzel, DOC Secretary; Jon D. Fisher, former Superintendent of the State Correctional Institute at Smithfield, PA ("SCI-Smithfield"); Mandy Biser, Prison Rape Elimination Act ("PREA") Compliance Manager at SCI-Smithfield; Brian Lightner, chair of the Initial Reception Committee ("IRC") at SCI-Smithfield; Candace Snyder, counselor on the IRC; Lieutenant J. Peck, member of the IRC; Christian Garman, Unit Manager assigned to the IRC; Deb Patton, Coleman's counselor and member of the Unit Management Staff at SCI-Smithfield; SCI-Smithfield Sergeant D. Shirey[1] ("Sgt. Shirey"); SCI-Smithfield Shift Commander Lieutenant Heaster ("Lt. Heaster"); Day Shift Correctional Officer T. Myers ("C.O.

---

[1] Although identified as Sergeant D. "Shirley" in the Second Amended Complaint, subsequent discovery documents refer to this Defendant's last name as "Shirey." Accordingly, the Court uses Shirey for the purposes of this Report and Recommendation.

Myers"); Day Shift Correctional Officer T. Glass ("C.O. Glass"); Day Shift Correctional Officer C. Jones ("C.O. Jones"); Day Shift Correctional Officer D. Rinehart ("C.O. Rinehart"); Day Shift Correctional Officer M. McConaughey ("C.O. McConaughey"); Night Shift Correctional Officer D. Scott ("C.O. Scott"); Night Shift Correctional Officer J. Walters ("C.O. Walters"); and Night Shift Correctional Officer B. Nickum ("C.O. Nickum"). (Doc. 54).

Now pending before the Court is Defendants' motion for summary judgment. (Doc. 75). For the reasons stated herein, it is respectfully recommended that Defendants' motion be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND AND PROCEDURAL HISTORY[2]

The events giving rise to this action occurred in March 2014 while Coleman was incarcerated at SCI-Smithfield. Coleman filed the Original Complaint after his release from SCI-Smithfield, and, after a lengthy procedural history, filed the Second Amended Complaint on July 21, 2017. (Doc. 54). Therein, Coleman alleges that his cellmate, Gary Ausley ("Ausley"), physically and sexually assaulted him while the two shared a cell at SCI-Smithfield. (Doc. 54, at 1-24). In Count I of the Second Amended Complaint, Coleman brings a failure to protect claim against C.O. Myers, C.O. Glass, C.O. Jones, C.O. Rinehart, C.O. McConahughey (collectively, the "Day Shift C.O.s"), C.O. Scott, C.O. Walters, C.O. Nickum (collectively, the "Night Shift C.O.s"), Sgt. Shirey, and Lt. Heaster for failing to remove him from the cell prior to Ausley's assault. (Doc. 54, at 24-27). In Count II, Coleman brings a failure to protect claim against Defendants Lightner, Snyder, Peck,

---

[2] Due to the voluminous record in this case, the following procedural history focuses on the underlying facts that are relevant to the disposition of the pending motion for summary judgment.

Garman (collectively, the "IRC Defendants"), and Patton for assigning him to a cell with Ausley, despite the risk of serious harm the assignment posed. (Doc. 54, at 27-29). In Count III,[3] Coleman brings a failure to train and supervise claim against Defendants Wetzel, Fisher, and Biser (collectively, the "Supervisory Defendants") for their failure to implement proper cell assignment policies and procedures that would facilitate the prevention of potential sexual assaults. (Doc. 54, at 3, 29-31).

On September 14, 2018, Defendants filed a motion for summary judgment (Doc. 75), along with a supporting brief (Doc. 78), a statement of material facts (Doc. 77), and exhibits. (Doc. 76). After receiving an extension of time, and moving to file certain documents under seal, Coleman filed a redacted brief in opposition (Doc. 94), a response in opposition to Defendants' statement of material facts (Doc. 95), and a counter statement of material facts (Doc. 93) on December 14, 2018. Coleman also filed additional supporting exhibits on December 18, 2018. (Doc. 99). Defendants subsequently filed a redacted reply brief on February 14, 2019. (Doc. 110).

Having been fully briefed, Defendants' motion is ripe for disposition.

---

[3] Notably, Count III of the Second Amended Complaint only focuses on the allegedly deficient procedures that pertained to the reporting of potential sexual assaults by inmates. (Doc. 54, at 29-31). However, the beginning of the Second Amended Complaint, as well as Coleman's brief in opposition, also complains of the Supervisory Defendants' inadequate cell assignment policies. (Doc. 54, at 3; Doc. 94, at 36-41). In their reply brief, Defendants note that Coleman has previously disclaimed the existence of such an inadequate cell assignment policy claim. (Doc. 110, at 20). Nonetheless, Defendants' previous brief in support of summary judgment addressed both claims. (Doc. 78).

In the interest of completeness, the Court addresses Coleman's cell assignment policy claim and his inadequate reporting policy claim.

## II.   SUMMARY OF MATERIAL FACTS[4]

### A.   FACTS REGARDING THE DOC'S INMATE SCREENING PROCESS AND DOUBLE CELLING PROCEDURES

Upon entering DOC custody, every inmate starts at a diagnostic center for classification in accordance with DOC Procedures Manual 11.2.1 ("Policy 11.2.1"). (Doc. 77, at 1-2, ¶¶ 1-2, 4). At the diagnostic center, DOC staff members evaluate an inmate's custody level, perform psychological testing, and complete an integrated case summary for the inmate, which includes an IQ test. (Doc. 77, at 2, ¶¶ 5-7; Doc. 95, at 1, ¶ 6). To assign an inmate's custody level, the DOC administers the Pennsylvania Additive Classification Tool ("PACT").[5] (Doc. 77, at 3, ¶ 13). After evaluating certain risk and stability factors, the PACT assigns custody levels ranging from one to five, with levels two to four pertaining to general population inmates. (Doc. 77, at 4, ¶¶ 14, 17). The National Institute of Corrections has found that there are strong correlations between the classification levels determined by the PACT and inmate misconduct, and inmates are reclassified on an annual basis. (Doc. 77, at 4-5, ¶¶ 16, 20). As part of this reclassification, the PACT is re-administered to determine any changes in custody level, and considers additional factors related to the inmate's institutional adjustment. (Doc. 77, at 5, ¶ 20).

---

[4] Unless otherwise indicated, the facts provided below are taken from the Parties' statement of material facts, responses thereto, and supporting exhibits from the record. (Doc. 76; Doc. 77; Doc. 93; Doc. 95; Doc. 99).

[5] Coleman adds that the PACT has since been replaced with a more effective screening tool, the Prison Risk Assessment Tool ("PRAT"). (Doc. 93, at 8, ¶ 80; Doc. 95, at 2, ¶ 13). The PACT was not compliant with the PREA. However, the PRAT complies with the PREA. (Doc. 93, at 8, ¶ 82).

Inmates are also screened pursuant to DC-ADM 008,[6] Section 2A, for "any indication of a history of sexual victimization or sexual predatory behavior." (Doc. 77, at 3, ¶¶ 9-10). This screening includes a review of an inmate's misconduct history, prior program codes, and security concerns listed in the Unit Management System. (Doc. 77, at 3, ¶ 11). Inmates identified as potential victims pursuant to DC-ADM 008 are considered for placement in the special needs unit ("SNU"). (Doc. 77, at 3, ¶ 12). Conversely, inmates identified as sexual predators are assigned a Z-Code, which is a designation that requires single-cell status. (Doc. 77, at 3, ¶ 12; Doc. 77, at 5, ¶ 21). Inmates may be assigned a Z-Code at any time during their incarceration, and are periodically evaluated for the necessity of such a housing status. (Doc. 77, at 5, ¶¶ 21-22; Doc. 95, at 2, ¶ 21). Coleman denies these facts insofar as not all inmates who receive Z-Codes are sexual predators, and appropriate housing assignments are not always made under this screening system. (Doc. 95, at 2, ¶ 12).

Policy 11.2.1 also establishes certain criteria that staff shall carefully review when considering an inmate for a Z-Code. (Doc. 77, at 5, ¶ 24). Such criteria include (1) an inmate who has been evaluated by psychiatric or psychological staff as posing a danger to others, (2) inmates who have a documented history of aggressive or predatory behavior towards cell partners, or who staff have reason to believe would exhibit such behavior, and (3) an inmate who staff believes may be victimized as a result of double celling. (Doc. 77, at 6, ¶ 25). Upon reviewing an inmate for a Z-Code, facility staff review documents and information reflecting the inmate's institutional adjustment, such as misconduct reports, recommendations from medical and/or psychiatric staff, and reports from other staff

---

[6] DC-ADM 008 also covers the dangers of inmate-on-inmate sexual assaults. (Doc. 93, at 7, ¶ 69).

members with knowledge of the inmate's behavior. (Doc. 77, at 6, ¶ 26). If a change in Z-Code status is recommended, the staff circulates a DC-46 vote sheet, along with other relevant information, to the facility manager for their final decision on the matter. (Doc. 77, at 6, ¶ 27).

After being classified at the diagnostic center, the inmate is then assigned to a home institution. (Doc. 77, at 7, ¶ 31). Upon arriving at their home institution, the inmate meets with the facility's IRC. (Doc. 77, at 7, ¶ 32). In accordance with Section 5 of Policy 11.2.1, the IRC interviews the inmate and reviews their available records to determine an appropriate housing assignment. (Doc. 77, at 8, ¶ 34). During this interview, the IRC considers the inmate's cellmate preferences and accommodates them to the extent possible. (Doc. 77, at 8, ¶ 36). The IRC also informs the inmate of double celling conditions, as well as the procedures in place for requesting the termination of double celling or reporting double celling issues. (Doc. 77, at 8, ¶ 35).

Defendant Lightner's responsibilities include making an initial cell assignment for incoming inmates. (Doc. 77, at 22, ¶ 166). However, the IRC members at SCI-Smithfield regularly collaborate on cellmate assignments and change the pre-assignments made by Defendant Lightner. (Doc. 93, at 3, ¶¶ 22-23). While Defendant Lightner had access to the full files of inmates for whom he considered cellmate pairings, he ultimately only considered whether an inmate had a Z-Code. (Doc. 93, at 3, ¶¶ 26-27). Further, besides looking for the presence of a Z-Code, the IRC did not consider a real or potential imbalance of power between cellmates. (Doc. 93, at 4, ¶ 31). Policy 11.2.1, however, instructs that staff shall review inmate records to determine whether an imbalance of power exists that could lead to the victimization of the weaker inmate. (Doc. 93, at 4, ¶ 33).

Due to the inmate's screening at the diagnostic center, their PACT classification, and the double celling considerations under Policy 11.2.1, Defendants contend that potential cellmates for an incoming inmate are pre-screened. (Doc. 77, at 8-9, ¶ 38). If staff has reason to believe that an inmate has the potential for assaultive behavior, Defendants assert that they would have received a Z-Code and been prohibited from double celling. (Doc. 77, at 9, ¶ 39). Coleman denies this fact, however, and notes that inmates such as Ausley were found to be potentially physically assaulted without being given a Z-Code. (Doc. 95, at 4, ¶ 39). Further, IRC members knew that characteristics such as age, physical size, history of violence, intellectual ability, experience with incarceration, and security threat group status could affect the balance of power between inmates. (Doc. 93, at 4, ¶ 32).

B. FACTS REGARDING THE SCREENING AND CLASSIFICATION OF COLEMAN AND AUSLEY

Before his assignment to SCI-Smithfield, Coleman was screened two times for sexual abuse or victimization pursuant to DC-ADM 008. (Doc. 77, at 11, ¶¶ 48, 50). Both screening reports—the first completed upon his initial reception on January 24, 2014 and the second completed at the diagnostic center on January 31, 2014—indicated that Coleman was not an inmate that was at risk for sexual victimization. (Doc. 77, at 11, ¶¶ 48-50). Coleman disputes these facts, however, to the extent that they imply the results of the screenings were correct. (Doc. 95, at 5, ¶¶ 48, 50). Pursuant to the administration of the PACT during his initial classification, Coleman was also assigned a level three custody status requiring medium supervision. (Doc. 77, at 13, ¶ 59).

During his orientation at the diagnostic center, Coleman received a training course on sexual abuse/assault prevention and intervention on February 3, 2014. (Doc. 77, at 11, ¶ 51). Shortly thereafter, Coleman completed an "Initial Reception Mental Health

Questionnaire" on February 5, 2014. (Doc. 77, at 11, ¶ 52). In this questionnaire, Coleman represented that he had not been sexually assaulted during his incarceration and had no concerns regarding coerced sexual activity. (Doc. 77, at 12, ¶ 53). Upon completing Coleman's mental health screening report on February 6, 2014, the diagnostic center determined that Coleman was not at particular risk of victimization. (Doc. 77, at 12, ¶¶ 54-55). The screening report also noted that Coleman had scored "extremely low" on his Beta III I.Q. test, but presented no indication of remedial functioning during his clinical interview. (Doc. 77, at 12, ¶ 56). Because the diagnostic center did not flag any security concerns with double celling Coleman, he was not given a Z-Code. (Doc. 77, at 12, ¶ 57). Coleman was subsequently assigned to SCI-Smithfield. (Doc. 77, at 13, ¶ 60). Upon his arrival on March 6, 2014, Coleman was screened again under DC-ADM 008 but found not to be an inmate that was at risk for victimization. (Doc. 77, at 13, ¶ 61). During his IRC meeting at SCI-Smithfield, Coleman met with Defendants Lightner, Peck, Garman, and Snyder. (Doc. 93, at 3, ¶ 17).

As to Ausley, he was initially classified at the diagnostic center on April 21, 2010 but not assigned a Z-Code. (Doc. 77, at 13-14, ¶¶ 63, 66). Ausley was eventually transferred to SCI-Smithfield on September 10, 2013 and received an annual reclassification on September 27, 2013. (Doc. 77, at 14, ¶¶ 67, 69). During this reclassification, the PACT was re-administered and assigned Ausley a custody level of three. (Doc. 77, at 14-15, ¶¶ 70, 73). After his transfer to SCI-Smithfield, Ausley submitted requests to staff members to review him for single-cell status. (Doc. 77, at 15, ¶ 74). Ausley requested a single cell because he self-reported that he could not have a cellmate based on his paranoid thinking and loss of control while off his medications. (Doc. 77, at 16, ¶ 81). In Ausley's cumulative adjustment

8

notes, however, SCI-Smithfield Psychiatrist Dr. Dolphin advised that he was medically stable to have a cellmate and "just wanted a Z-Code however possible." (Doc. 77, at 17, ¶ 82).

On October 3, 2013, Ausley wrote to staff that "I felt the strong need to kill my last cellmate." (Doc. 93, at 2, ¶ 16). On October 7, 2013, staff voted on Ausley's request for single cell status, but did not feel that a Z-Code was warranted and denied his request. (Doc. 77, at 17-18, ¶¶ 83, 88-89). Ausley grieved the denial on November 12, 2013, writing "I need my own space and it will happen one way or the other." (Doc. 77, at 18, ¶¶ 90, 92). As a result of that statement, Ausley was issued a misconduct for "threatening another person." (Doc. 77, at 18, ¶ 93). Coleman disputes, however, that any words "perceived as threatening" are enough to issue such a misconduct. (Doc. 95, at 9, ¶ 94). Coleman further contends that staff viewed this language as a threat towards future cellmates. (Doc. 93, at 2, ¶ 15).

On February 10, 2014, a John Doe Inmate spoke with Superintendent Fisher about a proposition that Ausley had made to him. (Doc. 7, at 20, ¶¶ 103-04). Ausley proposed that, in an effort for him to obtain a permanent Z-Code, they would agree to cell together and stage an attack on Ausley. (Doc. 77, at 20, ¶¶ 104-05). Defendants thus contend that Defendant Fisher and the Security Officer knew that Ausley was scheming to manipulate his housing status. (Doc. 77, at 21, ¶ 110). Coleman denies this fact, and asserts that, if believed, Ausley's actions demonstrate that he was prepared to go to great lengths, including inflicting pain on himself, to obtain a Z-Code. (Doc. 95, at 10, ¶ 110).

C. FACTS REGARDING THE EVENTS OF MARCH 6, 2014

At all times relevant to this action, Coleman, who had been convicted of driving

under the influence in 2009, was serving his second period of incarceration within the DOC for violating his probation.[7] (Doc. 77, at 9, ¶ 42). Specifically, Coleman had failed to report to a probation officer for a check in and was re-sentenced to a 1 year to 2-year sentence beginning on January 24, 2014. (Doc. 77, at 10, ¶ 47; Doc. 95, at 5, ¶ 47). Ausley was serving a 15 year to 30-year sentence for a third-degree murder conviction. (Doc. 77, at 13, ¶ 62). Defendants assert that, prior to Coleman's allegations, Ausley had no known history of sexual assault or sexual harassment. (Doc. 77, at 14, ¶ 65). Coleman, however, states that Ausley's conviction stemmed from the murder of a prostitute after he refused to pay her. (Doc. 93, at 2, ¶ 8; Doc. 95, at 6, ¶ 65).

Coleman arrived at SCI-Smithfield on March 6, 2014. (Doc. 77, at 28, ¶ 149). After meeting with the IRC, Coleman was assigned to cell 44 on K block with Ausley. (Doc. 77, at 28, ¶¶ 150-54). At the time, Ausley was twenty-seven (27) years old, approximately six feet two inches tall, and weighed two hundred and forty (240) pounds. (Doc. 93, at 2, ¶ 6; Doc. 93-2, at 17). Ausley was also a documented member of the Gorilla Stone set of the Bloods gang at SCI-Smithfield.[8] (Doc. 93, at 2, ¶ 9). By comparison, Coleman was forty-six (46) years old, approximately five feet nine inches tall, and weighed one hundred and sixty-two (162) pounds. (Doc. 93, at 1, ¶¶ 2, 5). The DOC further documented that Coleman had an IQ of 66 with an "extremely low" intellectual rating, whereas Ausley had a documented

---

[7] Coleman's criminal history consists of alcohol related DUI offenses. (Doc. 93, at 1, ¶ 4).

[8] Defendants assert that the mere fact that Ausley was in a gang and convicted of 3rd degree murder does not, standing alone, make him a security risk with respect to double cell assignments or potential assaults on cellmates. (Doc. 77, at 20, ¶ 101-02). Coleman disputes this notion and submits that no single factor is considered in isolation. (Doc. 95, at 9, ¶¶101-02).

IQ of 99. (Doc. 93, at 1-2, ¶¶ 1, 10).

Upon Coleman's arrival at the cell, Ausley indicated that he did not want him to be there and demanded that Coleman go elsewhere. (Doc. 77, at 28, ¶ 154; Doc. 93, at 14, ¶ 154). Ausley then directed Coleman to seek reassignment and provided him with a script to read to the C.O.s over their cell's intercom. (Doc. 77, at 29, ¶¶ 155-56). Coleman obliged, but Defendants state that Ausley did not threaten to rape or kill Coleman at the time he pressed the intercom to communicate with the C.O.s. (Doc. 77, at 29, ¶ 159). Coleman, however, submits that he felt threatened by Ausley looking at him aggressively, speaking loudly, and cursing at him repeatedly, even telling Coleman "I'll fuck you up." (Doc. 77, at 29, ¶ 158; Doc. 93, at 15, ¶ 158). Further, when speaking with the C.O.s over the intercom, Coleman did not expressly tell them that he had been threatened. (Doc. 77, at 29, ¶ 160). However, Coleman states that he communicated using the words Ausley had forced him to say and did not feel comfortable indicating that he felt threatened while Ausley was in the cell with him. (Doc. 77, at 15, ¶¶ 159-60).

Coleman then stopped C.O. Scott, who was doing security rounds on K Block during the 10 PM to 6 PM shift, at his cell. (Doc. 77, at 30, ¶ 163). Coleman expressed to C.O. Scott that he needed out of his cell but did not provide any further information. (Doc. 77, at 30, ¶ 164). When C.O. Scott asked Coleman if he was being harassed, threatened, or assaulted, Coleman replied in the negative. (Doc. 77, at 30, ¶ 165). In response to these facts, Coleman again asserts that he did not feel comfortable expressing his concerns in the presence of Ausley. (Doc. 93, at 15, ¶¶ 164-65). While C.O. Scott did not perceive Coleman as being scared or in distress during their interaction, he also knew that inmates were less likely to report threats involving cellmates when they still in the cell with them. (Doc. 77, at

11

30, ¶ 166; Doc. 93, at 5, ¶ 40). C.O. Scott, however, did not attempt remove Coleman from his cell to speak further, and informed Coleman that he would speak with the Shift Commander, Lt. Heaster. (Doc. 77, at 30, ¶ 167; Doc. 93, at 5, ¶ 40).

C.O. Scott subsequently turned on the intercom in cell 44 to monitor Coleman and Ausley and to assess the situation. (Doc. 77, at 31, ¶ 170). While listening on the intercom, C.O. Scott heard Coleman and Ausley discussing ways for Coleman to be removed from the cell. (Doc. 77, at 31, ¶ 171). C.O. Scott and C.O. Walters, who was also working the 10 PM to 6 AM shift, further heard Coleman and Ausley intermittently laughing and joking, but did not hear threats or any indication of trouble coming from the cell. (Doc. 77, at 31, ¶ 172-73). In response, Coleman asserts that C.O. Scott and C.O. Walters overhead Ausley manipulating Coleman by telling him what to do and say, which demonstrates an imbalance of power that is a sign of trouble for experienced correctional officers. (Doc. 93, at 5, ¶ 43; Doc. 95, at 16, ¶ 173). Coleman further contends that laughter may often be a sign of discomfort as opposed to genuine laughter, which Defendants also acknowledge. (Doc. 93, at 5, ¶ 45).

When C.O. Walters performed his security rounds at approximately 12:20 AM, Coleman stood at his door and again stated that he needed out of his cell without elaborating why. (Doc. 77, at 31-32, ¶¶ 174-76). Coleman, however, told C.O. Walters that he needed to be removed about four times. (Doc. 93, at 5, ¶ 42). C.O. Scott, C.O. Walters, and C.O. Nickum[9] subsequently informed Lt. Heaster, the shift commander, that one of the

---

[9] Defendants assert that C.O. Nickum had no direct contact with Coleman or Ausley on the night in question. (Doc. 77, at 36, ¶ 206). However, Coleman contends that C.O. Nickum, who worked the 10 PM to 6 AM shift on K block, listened to him and Ausley over the intercom. (Doc. 93, at 18, ¶ 206).

K block inmates wanted to be removed from his cell. (Doc. 77, at 32, ¶ 177). The C.O.s indicated that the inmate did not provide a reason for wanting to be moved, and Lt. Heaster sent Sgt. Shirey to talk to Coleman further. (Doc. 77, at 32, ¶¶ 178-79). According to Coleman, C.O. Scott, C.O. Walters, and C.O. Nickum also apprised Sgt. Shirey of the situation, as they perceived it, but indicated that the matter posed no issue. (Doc. 93, at 5, ¶¶ 46-47).

Sgt. Shirey, accompanied by C.O. Walters, eventually responded to Coleman's cell. (Doc. 77, at 32, ¶ 180). Although Coleman repeated his request to be removed, he did not tell Sgt. Shirey why. (Doc. 77, at 32, ¶ 181). When asked if Ausley had assaulted or threatened him, Coleman again responded no. (Doc. 77, at 33, ¶ 183). Coleman reasserts that he replied in the negative because Ausley remained in the cell with him. (Doc. 95, at 16, ¶ 183). Despite asking to be moved, Sgt. Shirey perceived that Coleman seemed calm and unafraid, and did not hear Coleman complain that he was in fear. (Doc. 77, at 33, ¶¶ 184-85). Based on Coleman's demeanor and his representations during their interaction, as well as the information provided by the Night Shift C.O.s, Sgt. Shirey determined that Coleman was not in immediate danger and did not require removal him from the cell. (Doc. 77, at 33, ¶ 186). Coleman notes, however, that other readily apparent information was available to Sgt. Shirey, such as the disparity both in physical size and mental acuity that existed between Coleman and Ausley. (Doc. 95, at 17, ¶ 186).

After leaving the cell, Sgt. Shirey relayed his assessment of the situation to Lt. Heaster. (Doc. 77, at 33, ¶ 188). Coleman, however, contends that Sgt. Shirey downplayed the information he reported to Lt. Heaster. (Doc. 93, at 5, ¶ 48). Lt. Heaster also spoke with C.O. Scott, who indicated that he perceived Coleman and Ausley as working together

13

cooperatively to change their cell assignment. (Doc. 77, at 34, ¶ 193). Coleman denies this assertion as stated and submits that, even if he may have heard Ausley's manipulation of Coleman, C.O. Scott did not hear a "bi-lateral discussion" between the inmates. (Doc. 95, at 17, ¶ 193). Beyond the information he received from Sgt. Shirey and the Night Shift C.O.s, and without making any further investigation of his own, Lt. Heaster determined that Coleman and Ausley's cell assignment did not pose a risk of serious harm. (Doc. 77, at 34, ¶ 195; Doc. 93, at 5, ¶ 49).

After his interaction with Sgt. Shirey, Coleman did not press the intercom any further and remained in the cell with Ausley. (Doc. 77, at 33, ¶ 187). Ausley then proceeded to sexually assault Coleman in their cell on the night of March 6, 2014. (Doc. 93, at 6, ¶ 53). Coleman informed staff of the assault the following morning, when he was outside of the cell. (Doc. 93, at 6). Coleman continues to suffer mental and emotional harm as a result of the sexual assault. (Doc. 93, at 6, ¶ 55).

III.   **STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party,

and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990); *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F.Supp.2d 490, 493 (E.D. Pa. 2010) (finding that "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV.   DISCUSSION

Defendants move for summary judgement on all three counts of Coleman's Second Amended Complaint. First, with respect to the failure to protect claim against the IRC

Defendants and Defendant Patton, Defendants assert that, based on the classification system in effect at the time, there is no evidence they knew of a serious risk of harm that would befall Coleman by celling him with Ausley, or that they were deliberately indifferent to such a risk. (Doc. 78, at 23-42). Next, with respect to the failure to protect claim against the Day Shift C.O.s, the Night Shift C.O.s, Sgt. Shirey, and Lt. Heaster, Defendants argue that, considering Colemans' vague requests to be reassigned, there is no evidence that they were deliberately indifferent to a serious risk of harm when they failed to remove Coleman from his cell. (Doc. 78, at 42-51). Regarding the failure to train and supervise claims against the Supervisory Defendants, Defendants contend that Coleman has failed to establish that their training was deficient, let alone a substantial factor in his sexual assault (Doc. 78, 52-62). Finally, Defendants argue that they are entitled to qualified immunity because they did not violate a clearly established constitutional right regarding their compliance with specific sexual assault protocols. (Doc. 78, at 63-71).

## A. SECTION 1983 CLAIMS

Coleman's complaint asserts federal civil rights claims brought pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action with respect to violations of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To

establish a § 1983 claim, a plaintiff must establish that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). The Eighth Amendment[10] protections that Coleman invokes are incorporated against state actors through the substantive due process clause of the Fourteenth Amendment. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947).

### B. CLAIMS AGAINST DEFENDANT PATTON AND THE DAY SHIFT C.O.s

At the outset, Defendants move for summary judgement as to any claims against Defendant Patton and the Day Shift C.O.s. (Doc. 78, at 41-42; Doc. 78, at 50-51). Notably, Plaintiff concedes that summary judgment "may be appropriate" as to these Defendants. (Doc. 94, at 13). "The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the record reveals that Defendant Patton and the Day Shift C.O.s had no contact with Coleman on March 6, 2014. (Doc. 78, at 41-42; Doc. 78, at 50-51). Specifically, Defendant Patton did not participate in the IRC on the day of the incident, played no role in the cell assignment of Coleman and Ausley, and was off duty by 4:30 P.M. (Doc. 77, at 27, ¶¶ 144-47). Additionally, the Day Shift C.O.s worked until 10:00 P.M. on the night of the incident, and Coleman did not begin to push the call button in his cell until after their shifts were over. (Doc. 77, at 29, ¶ 157; Doc. 77, at 34-36,

---

[10] In Counts I and II, Coleman asserts violations of both his Eighth and Fourteenth Amendment rights. (Doc. 54, at 24-29). However, his claims brought pursuant to the Eighth Amendment appear to be the same as his claims brought pursuant to the Fourteenth Amendment. (Doc. 54, at 24-29). Accordingly, Coleman's failure to protect claim must be asserted under the more explicit constitutional amendment. *Ordonez v. Yost*, 289 F. App'x 553, 555 (3d Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). As such, the Court considers Coleman's failure to protect claims under the Eighth Amendment standard.

¶¶ 195-204). Therefore, the record reveals that Defendant Patton and the Day Shift C.O.s were not involved in the incident as they either did not participate in the housing arrangement or were already off duty when problems arose between Coleman and Ausley. Most importantly, Coleman neither disputes these facts nor presents any evidence to the contrary. (Doc. 94, at 13). Therefore, Defendants have established that there is no genuine dispute of material fact with respect to Coleman's claims against these individuals.

For these reasons, the Court respectfully recommends that Defendants' motion for summary judgment be **GRANTED** as to Defendant Patton, C.O. Meyers, C.O. Glass, C.O. Jones, C.O. Rinehart, and C.O. McConaughey.

## C. FAILURE TO PROTECT CLAIMS – COUNTS I AND II

The Eighth Amendment protects prisoners from being subjected to cruel and unusual punishment. U.S. CONST. AMEND. VIII. Here, Coleman alleges that the Defendants failed in their "duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To prevail on any Eighth Amendment claim, an inmate must meet both an objective and subjective requirement: (1) the alleged deprivation must be sufficiently serious; and (2) the defendant official must have "a sufficiently culpable state of mind." *See Farmer*, 511 U.S. at 834. Further, to survive summary judgment on a failure to protect claim brought under the Eighth Amendment, a plaintiff must demonstrate that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012); *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

A prison official acts with a sufficiently culpable state of mind where the official displays deliberate indifference to the inmate's safety by recklessly disregarding a known and substantial risk of harm to the inmate. *Farmer*, 511 U.S. at 836. This can be established by "circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2011) (citing *Farmer*, 511 U.S. at 842); *see also Hamilton,* 117 F.3d at 747 ("A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence."). However, a prison official does not violate the Eighth Amendment's proscription of cruel and unusual punishment by failing "to alleviate a significant risk that he should have perceived but did not . . . ." *Farmer*, 511 U.S. at 838; *see also Davidson v. Cannon,* 474 U.S. 344, 347–48 (1986) (a prison official's negligent conduct that results in injury inflicted by an inmate on another inmate does not amount to a constitutional violation under the Eighth Amendment). Further, a defendant may rebut prima facie claim of deliberate indifference by "establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers-Capitol*, 256 F.3d at 133; *Farmer,* 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause.").

### 1. Objective Inquiry

Defendants assert that double celling Ausley with Coleman, and later deciding that he should remain in the cell, did not pose an obvious risk of serious harm. (Doc. 78, at 27; Doc. 78, at 43). In support of this contention, Defendants state that Ausley had no prior history of assaulting cellmates, had not received any misconducts for violent behavior

during his incarceration, and had not been identified as a risk for sexual predation upon his screenings under DC-ADM 008. (Doc. 78, at 26-27; Doc. 76-6; Doc. 76-7). In addition, Defendants state that the PACT classification tool revealed that Coleman and Ausley had the same custody level when they were assigned as cellmates. (Doc. 78, at 30). According to Defendants, these screenings and objective PACT classifications establish that neither Coleman nor Ausley required a Z-Code. (Doc. 78, at 36-37).

Further, to the extent Ausley made statements threatening to harm potential cellmates, Defendants aver that such statements were thoroughly considered by DOC staff members and ultimately discounted. (Doc. 78, at 37). Specifically, DOC employees, upon voting to reject Ausley's single cell request, determined that Ausley had merely attempted to manipulate his housing status and obtain a Z-Code out of convenience. (Doc. 78, at 33-35; Doc. 76-9). Upon grieving the denial of his single cell request, Ausley stated "I need my own space and it will happen one way or the other." (Doc. 78, at 33-34; Doc. 76-10, at 2). However, even though Ausley consequently received a misconduct charge for "Threatening Another Person," Defendants assert that the hearing examiner perceived his comments as posing an idle threat. (Doc. 78, at 34). Based on this evidence, Defendants submit that Ausley was not an objective risk to potential cellmates. (Doc. 78, at 32-36).

In response, Coleman argues that there is a substantial risk of sexual assault when inmates with certain characteristics are celled together. (Doc. 94, at 15). In support, Coleman cites to DC-ADM 008, which outlines several predictors of the escalated risk for one inmate assaulting another:

> Characteristics of a sexually aggressive inmate, include, but are not limited to the following:

1. Between the ages of 27 and 45; 2. Medium to large build and possessing physical strength; 3. Aggressive in nature; 4. Having limited ties to outside family and friends and having no outside means of financial support; 5. Incarcerated for sex offenses or other violent offenses; 6. More streetwise and gang affiliated; 7. More accustomed to prison life; 8. May have difficulty controlling anger; 9. May display poor coping skills/strategies; 10. May exhibit voyeuristic/exhibitionist behavior; 11. Doing a substantial amount of time; and/or 12. Established him/herself by power and strength with the prison inmate hierarchy.

…

Characteristics of an inmate who may be targeted as a victim or prey, include, but are not limited to the following:

1. Generally between 16 to 26 years of age; 2. Small build and not seen as strong in appearance; 3. Seen as possessing "feminine" characteristics; 4. First time offenders; 5. Well connected to outside family and friends and with outside means of financial support; 6. Identified as homosexual or have been previously raped; 7. Convicted of sexual offenses against a minor; and/or 8. Appear passive, timid, or weak willed.

(Doc. 76-37, at 28-29, DC-ADM 008 § 6.D.1-12, § 6.E.1-8)

Coleman also relies on a report completed by correctional expert Jeanne S. Woodford. (Doc. 93-2). In her report, Ms. Woodford asserts that Ausley possessed several characteristics of a sexually aggressive inmate at the time of the assault, such as his age, his medium to large build, his incarceration for third degree murder, his gang affiliation, and his substantial prison sentence. (Doc. 93-2, at 17, 21-22; Doc. 94, at 15). By comparison, Ms. Woodford contends that Coleman possessed several characteristics of an inmate prone to victimization at the time of the assault, such as his small build and not seeming strong in appearance, his seeming to possess feminine characteristics, and his appearance as seeming passive, timid or weak willed. (Doc. 93-2, at 13, 21-22; Doc. 94, at 15). Given these contrasting characteristics, Ms. Woodford opines that Coleman and Ausley should not have been celled together. (Doc. 93-2, at 22). What's more, Coleman asserts that an obvious and

21

stark imbalance of power existed between him and Ausley. (Doc. 93-2, at 22; Doc. 94, at 19).

Coleman further argues that Ausley's risk assessment did not accurately convey his fitness to be celled with an inmate like Coleman. (Doc. 94, at 20). Notably, the record reveals that, prior to the incident at issue, Ausley's most recent reclassification occurred on September 27, 2013. (Doc. 76-7). This reclassification stated that Ausley had a custody level of 3 and that he was due to be re-classified in 6 months. (Doc. 76-7). Defendants contend that such reclassifications consider an inmate's institutional adjustments, as well as any recent misconducts. (Doc. 110, at 8). However, while the September reclassification stated that Ausley had received no disciplinary reports in the past 12 months, it predated Ausley's November misconduct charge for threatening another inmate. (Doc. 76-7; Doc. 76-9). Moreover, while Defendants assert that Ausley's September re-classification took place "just months before the assault," the record also establishes that he was nearly due for his 6-month re-classification when the incident occurred on March 6, 2014. (Doc. 76-7).

Courts have found that pairing an inmate who is particularly vulnerable to sexual assault with "an older, stronger, and predatory inmate" is sufficient to satisfy the objective component of an Eighth Amendment claim. *See McCracken v. Haas*, 324 F.Supp.3d 939 (E.D. Mi. 2018); *see also Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) ("A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror."). Here, the record shows that Coleman and Ausley possessed several contrasting characteristics that, according to DOC policy, were predictors for elevated risks of sexual assault. (Doc. 76-37; Doc. 93-2). Further, Ausley's PACT reclassification did not account for his most recent

misconduct involving threatening an inmate, which in this case was a potential future cellmate. (Doc. 76-7; Doc. 76-10). Moreover, according to the expert opinion of Ms. Woodford, Ausley's escalating misconduct record demonstrated a "history of having problems accepting a cellmate." (Doc. 93-2, at 21-22). Thus, when drawing all justifiable inferences in Coleman's favor as the non-moving party, the Court finds that a genuine dispute of material fact exists as to whether Coleman was still susceptible to victimization when celled with Ausley, despite neither having a Z-Code, as a reasonable jury could conclude that Coleman's assignment, and the subsequent decision to leave him in the cell despite his repeated requests to be removed, incarcerated him under conditions that posed an objective risk of serious harm. *See McCracken*, 324 F.Supp.3d at 946; *see also Travillion v. Wetzel*, 765 F. App'x 785, 792 (3d Cir. 2019) (holding that discounting an inmate's history of misconduct reports upon determining whether the objective inquiry had been satisfied should have been reserved for the fact-finder); *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1075-76 (9th Cir. 2013) ("The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such much be decided by a jury if there is any room for doubt.").

For these reasons, the Court finds that the objective inquiry regarding Coleman's failure to protect claims survives summary judgment.

## 2. Subjective Inquiry – Count II

In Count II of the Second Amended Complaint, Coleman alleges that the IRC Defendants acted with deliberate indifference when they assigned him to a cell with Ausley, despite knowing of the serious risk of harm that it posed. (Doc. 54, at 28). Coleman again points to DC-ADM 008 and the PREA training provided to DOC employees, which

acknowledges the risk of sexual assault to inmates in prison. (Doc. 94, 19). Given that the IRC Defendants received training regarding both DC-ADM 008 and the PREA, Coleman avers that they knew of these predictors and the heightened risk of harm when inmates with contrasting characteristics were paired together. (Doc. 94, at 16). As such, Coleman argues that the IRC Defendants were aware of certain facts from which it could be inferred that a serious risk of harm existed when they celled Coleman with Ausley. (Doc. 94, at 14).

a. *Defendant Lightner*

In moving for summary judgment, Defendants assert that Defendant Lightner justifiably relied on the screening and classification systems that were in place when making Coleman's cell assignment. (Doc. 78, at 23). According to the Defendants, given that Ausley, a custody level 3 inmate, lacked a Z-code and had no prior history of assaulting other inmates, Defendant Lightner concluded that celling him with Coleman, a custody level 3 inmate who also lacked a Z-code, did not create a known serious risk of harm. (Doc. 78, at 26-27). Defendants also argue that there is no evidence Defendant Lighter had any information available to him that would have put him on notice that an obvious risk of harm existed when he decided to cell Coleman with Ausley. (Doc. 78, at 26). In further support of this contention, Defendants aver that the record does not establish that Defendant Lightner was aware of the facts or details underlying Ausley's single cell requests and related grievances. (Doc. 110, at 10).

Notably, in his deposition testimony, Defendant Lightner stated that he cannot recall his specific IRC meeting with Coleman, let alone any familiarity or concerns with Ausley upon deciding to pair them as cellmates. (Doc. 99). Coleman asserts, however, that DOC policies and training put Defendant Lightner on notice of the risk of inmate on inmate

sexual assault, especially when they possessed certain contrasting characteristics. (Doc. 94, at 19). Coleman further notes that Defendant Lightner undisputedly had the opportunity to review this information upon making the cell assignment. (Doc. 94, at 19-22). However, according to Coleman's expert, "[t]he focus of the IRC committee was on the newly arriving inmate with no consideration of the case factors of the inmate already housed in the cell other than determining the absence of a Z code." (Doc. 93-2, at 16). As such, regardless of whether Defendant Lightner actually reviewed Ausley's characteristics and misconduct history, Coleman argues that Defendant Lightner's knowledge of, and deliberate indifference to, cell assignments that placed inmates in jeopardy of victimization can be inferred. (Doc. 94, at 18-20).

In response, Defendants argue that while pairing inmates based on their personal characteristics may have been ideal, any failure to do so, in the absence of a known risk, does not create an obvious danger. (Doc. 110, at 15). Defendants also point to Policy 11.2.1 for the proposition that the impetus was on the Unit Management Staff, consisting of the counselors and unit managers of K block, to evaluate any imbalances of power between potential cellmates—not the IRC. (Doc. 110, at 10). Policy 11.2.1, which governs the processing procedures for double celling inmates, provides:

> During the inmate reception process, the **Initial Reception Committee, or designated responsible staff** shall ask the inmate if he/she has preferences affecting double celling compatibility … If the inmate indicates a preference (non-smoking cell, familial relationship, age, race, etc.), this information shall be documented and forwarded to the inmate's counselor for inclusion in the DC14, Cumulative Adjustment Record for future reference. To the extent reasonable, the inmate's indicated preferences should be accommodated … The facility does not have to move an inmate based solely on his/her request.
>
> The **Unit Management staff** shall review the inmates' records to determine whether there is an imbalance of power between the inmates that could lead to victimization of the weaker inmate. This review shall include: misconducts

(especially assaultive and sexually assaultive behavior), an inordinate number of cell partners for either inmate; evaluate for "Housing Concern" (Potential Sexual Assault Victim and/or Institutional Sexual Predator) and record any identified Housing Concern in DOC INFO by clicking on the appropriate box on the Security Concerns screen of the Unit Management System and entering the reason for this designation in the Comments box;

[O]r any other information that may suggest a potential for one inmate assaulting the other.

(Doc. 76-2, at 9-10, 11.2.1 § 5.2.b-d) (emphasis added).

Notably, according to the expert opinion of Ms. Woodford, the "careful selection of a cellmate," with attention to considerations such as age, commitment offense, gang or security threat group status, and physical characteristics, "is necessary to reduce or eliminate an imbalance of power between the cellmates." (Doc. 93-2, at 22). Ms. Woodford's report further opines that "each staff member thought it was someone else's responsibility to make cell compatibility decisions in compliance with PREA standards." (Doc. 99-2, at 16).

Upon review, the record does not belie Ms. Woodford's contention. For example, Coleman's counselor, Defendant Patton, stated in her deposition that although § 5.2.c of Policy 11.2.1 identities the "unit management staff" as being responsible for assessing potential imbalances of power, she understands this same provision as actually referring to the IRC. (Doc. 99-9, at 35). Further, Defendant Garman, the Unit Manger on K block, stated that if anyone on the IRC reviewed the characteristics of inmates for such compatibility concerns "it would be [Defendant Lightner]." (Doc. 99-13, at 41-42). What's more, Ms. Woodford's report states that all deposed staff members of the IRC "were able, to some degree, articulate the case factors that should be considered before assigning two inmates to the same cell…" (Doc. 93-2, at 16).

Additionally, in his own deposition testimony, Defendant Lightner stated that he understood the imbalance of power identified in Policy 11.2.1 to mean differences in physical size, mental health, and intelligence. (Doc. 99, at 22). Defendants acknowledge that a sixteen (16) year age difference existed between Ausley and Coleman, but assert that this, in and of itself, did not create such an obvious risk that Defendant Lightner could infer harm would result by double celling them. (Doc. 78, at 26). Similarly, Defendants argue that the size discrepancy between Ausley and Coleman did not support an inference of substantial danger. (Doc. 78, at 26-27). However, the record does not present a situation where Ausley and Coleman's predictors existed in isolation—to the contrary, Coleman has come forward with evidence that several differing characteristics existed between Coleman and Ausley, some of which Defendant Lightner acknowledged would generally suggest an imbalance of power.

"[A]n Eight Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Here, although a close call, the record could allow a reasonable factfinder to conclude that Defendant Lighter knew of the risk posed to Coleman, either upon considering the sexual assault predictors that existed upon comparing the characteristics of Coleman and Ausley, or by failing to do despite knowing that such factors created an imbalance of power that elevated the "weaker" inmate's risk of victimization. When construed in the light most favorable to the non-moving party, a reasonable juror could also find that Defendant Lightner knowingly disregarded the potential risk of harm that arose by designating Coleman to Ausley's cell. *Farmer*, 411 U.S. at 834 ("[I]t does not

matter whether…a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."). Simply stated, there is a genuine dispute of material fact as to whether Defendant Lightner had notice of the risk of harm posed to Coleman when he was celled with Ausley, and whether he disregarded that threat.

Therefore, the Court respectfully recommends that Defendants' motion for summary judgment be **DENIED** as to Defendant Lightner.

b. *Defendants Peck, Garman, and Snyder*

Defendants additionally argue that Defendants Peck, Garman, and Snyder—the remaining IRC Defendants—were not involved in Coleman's cell assignment, and that their roles on the IRC did not involve matching potential cellmates. (Doc. 78, at 41-42). In opposing summary judgment, Coleman argues that, according to Policy 11.2.1 SMI,[11] the entire IRC handled cell assignments. (Doc. 94, at 23). Coleman also points to Defendant Garman's deposition testimony, which states that the IRC members "relied on each other's experience and knowledge," and brainstormed certain cellmate assignments in harder cases. (Doc. 94, at 24). Thus, by allowing Coleman's cell assignment to stand, given the differing characteristics between him and Ausley and the potential threat such a pairing posed, Coleman claims that Defendants Peck, Garman, and Snyder were deliberately indifferent to an obvious risk of harm. (Doc. 94, at 25).

In their reply brief, Defendants state that Coleman merely points to selective information about Ausley that *should* have alerted the IRC Defendants about the pairing's potential for danger. (Doc. 110, at 9). Defendants further argue that the only other evidence

---

[11] Policy 11.2.1 SMI is the procedures manual specific to SCI-Smithfield. (Doc. 76-15).

Coleman relies upon is Ausley's misconduct history, which did not reveal any violent behavior. (Doc. 110, at 10). Further, Defendants characterize Ausley's misconduct charge for threatening another person as a veiled threat that did not create an obvious risk for being double celled. (Doc. 110, at 10). According to Defendants, Ausley's underlying grievance, wherein he stated that he needed his own space and that "it will happen one way or another," merely "was about Ausley attempting to get a single cell." (Doc. 110, at 10-11).

When viewing the facts in the light most favorable to the non-moving party, the Court finds that a genuine dispute of material fact exists as to Defendants Peck, Garman, and Snyder's subjective knowledge regarding Coleman's cell assignment. Specifically, given their understanding of the imbalances of power that existed amongst inmates, the differing characteristics that Coleman and Ausley possessed, and Ausley's most recent misconduct charge for threatening another inmate, a reasonable juror could find that Defendants Peck, Garman, and Snyder recognized that an excessive risk of harm existed—either upon considering such characteristics that suggested an imbalance of power, or failing to do so despite the increased potential for victimization that would result from the omission. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Further, Coleman has demonstrated that these Defendants conferred with Defendant Lightner regarding potential compatibility issues, even if they did not make the initial cellmate assignment. Thus, the Court cannot conclude that summary judgment is proper against the remaining IRC Defendants.

Therefore, it is respectfully recommended that Defendants' motion for summary judgment be **DENIED** as to Defendant Peck, Defendant Garman, and Defendant Snyder.

### 3. Subjective Inquiry – Count I

In Count I of the Second Amended Complaint, Coleman also asserts that Sgt. Shirey, Lt. Heaster, and the Night Shift C.O.s acted with deliberate indifference when they left him in a cell with Ausley, despite their awareness of Colemans' repeated entreaties to be removed and knowing that Ausley posed a serious risk of harm to him. (Doc. 54, at 25). In moving for summary judgment, Defendants argue that while Coleman made several requests to be moved, he failed to specify why. (Doc. 78, at 43). Further, Defendants claim that the Night Shift C.O.s, Sgt. Shirey, and Lt. Heaster investigated the situation and perceived Coleman as working cooperatively with Ausley to manipulate his cell assignment. (Doc. 78, at 43; Doc. 110, at 16). Accordingly, Defendants argue that there was nothing to impute their subjective knowledge that Coleman faced a serious risk of harm by remaining in the cell with Ausley. (Doc. 78, at 43).

In support of their argument, Defendants cite to *Jones v. Beard*, 145 F. App'x 743 (3d Cir. 2005) for the proposition that vague or unspecific requests to be moved to a new cell do not place prison guards on notice of a threat to serious harm. (Doc. 78, at 45). Indeed, Courts in this Circuit have found that general or vague complaints do not support the inference of a prison official's awareness of danger. *See, e.g., Blackstone v. Thompson*, 568 F. App'x 82, 84–85 (3d Cir. 2014) (no liability where plaintiff "had just one communication" with prison official, in which Plaintiff "stated that he was not 'getting along' and did not 'feel comfortable' with his cellmate"); *Bizzell v. Tennis*, 449 F. App'x 112, 115 (3d Cir. 2011) (plaintiff's complaints to prison officials that his eventual attacker was unstable and trying to set him up were insufficient to infer subjective knowledge when plaintiff did not complain about a threat to his safety); *but see Nestor v. Dir. of Ne. Region Bureau of Prisons*, No.

CIV. 11-4683 RBK/AMD, 2012 WL 6691791, at *5 (D.N.J. Dec. 20, 2012) (distinguishing between the concept of risk, which involves "various forces presenting a very real though indeterminate possibility of harm," and the concept of threat, noting that "it does not appear that the Supreme Court, in fashioning the contours of the Eighth Amendment deliberate indifference doctrine, requires a showing of particularized threats.") (citing *Farmer v. Brennan,* 511 U.S. 825 (1994)). Here, Defendants claim that while Coleman requested to be removed, he did not justify the basis for his request. Further, according to Sgt. Shirey and C.O. Walters, Coleman did not appear to be afraid when they spoke with him at his cell door. (Doc. 99-3, at 19; Doc. 99-7, at 35-36). C.O. Scott and C.O. Nickum also stated that they heard joking between the Coleman and Ausley over the intercom. (Doc. 99-5, at 41-42; Doc. 99-6, at 49-50).

In his deposition, however, Coleman stated that he was nervous about openly discussing his concerns when Ausley remained in the cell with him. (Doc. 93-3, at 45; Doc. 94, at 29). Coleman also points to the depositions of C.O. Nickum, C.O. Scott, and Lt. Heaster, in which they either acknowledged that an inmate would be less likely to discuss their housing concerns in front of their cellmate, or that they would be more likely to obtain better information from an inmate when they spoke about an issue in private. (Doc. 94, at 29; Doc. 99-4, at 18; Doc. 99-5, at 18; Doc. 99-6, at 19-20). Ms. Woodford's expert report notes the same apprehension as to Sgt. Shirey. (Doc. 94, at 4; Doc. 93-2, at 23). As such, Coleman effectively argues that Defendants did not give him an opportunity to fully explain the basis for his requests to be moved.

Further, the record does not reveal that Coleman had "just one communication" with prison officials. *Cf. Blackstone,* 568 F. App'x at 84–85. Coleman points to evidence that

he, on multiple occasions over the course of several hours, repeatedly requested to be removed. Specifically, Coleman interacted with C.O. Scott, and C.O. Walters[12] during their respective hourly rounds, and stopped each at his cell to ask that they move him. (Doc. 99-7, at 40-41). Moreover, the Night Shift C.O.s knew that Coleman was frequently utilizing the intercom to gain their attention. (Doc. 99-7, at 40). Sgt. Shirey then eventually responded to the cell, and Coleman communicated his same request to be removed. (Doc. 99-3, at 18).

As noted by Defendants, it is undisputed that Ausley instructed Coleman on what to say to the Night Shift C.O.s over the intercom. (Doc. 93-3, at 92-93). When asked about why he relayed Ausley's prompts, Coleman explained:

> A:    I said because I felt for my life. Even though [Ausley] wrote them and I said them I felt the same way. I wanted to get out. I wanted to get out of that cell just as bad as he wanted me out of there…because I feared for my life and safety.

(Doc. 93-3, at 93).

Moreover, although Defendants assert that Coleman did not explain his reasons for wanting to be moved, Coleman stated as follows:

> Q:    What is the first way you contacted the C.O. after Ausley told you he wanted you out of there?
>
> A:    I pressed the intercom. I stood up there for the longest time.
>
> Q:    What do you mean?
>
> A:    I was just pressing the intercom until I got somebody's attention. They finally answered. I told him I want to go to the hall. I fear for my life. I want lock up. Send me to medical.

---

[12] Defendant Walters also stated that, although Coleman did not explain why he wanted to be removed from the cell, he repeated that he needed to get out approximately four times. (Doc. 99-7, at 34).

Q:      Is that what Ausley had written on the paper for you to read?

A:      I'm not sure.

(Doc. 93-3, at 36-37).

Defendants contend that they perceived Coleman as cooperating with Ausley. However, Ms. Woodford's report disputes this fact and indicates that this situation—where Ausley told Coleman what to say—should have been cause for concern. (Doc. 93-2, at 23). Ms. Woodford's report also opines that the staff did not respond appropriately to Coleman's appeals. (Doc. 93-2, at 23-24). Specifically, during his calls through the intercom, Coleman expressly indicated that he was in fear and needed to be moved. (Doc. 93-2, at 23). Based on the laughter they heard from within the cell, however, staff assumed that Coleman was not actually afraid. (Doc. 93-2, at 23). Ms. Woodford also notes that it is unclear whether the C.O.s could determine that both inmates were laughing and joking. (Doc. 93-2, at 23). Based on these facts, Ms. Woodford states that staff should have, at a minimum, removed Coleman from the cell to interview him in private about the situation. (Doc. 93-2, at 23). Defendants argue that, at most, the failure to remove Coleman from his cell amounted to negligence. (Doc. 78, at 47).

a.  *C.O. Scott, C.O. Walters, and Sgt. Shirey*

As to C.O. Scott and C.O. Walters, Defendants argue that, while they did not have the authority to remove Coleman from his cell, they relayed the information they had through their chain of command. (Doc. 78, at 51). Given these facts, Defendants submit that Coleman cannot establish C.O. Scott and C.O. Walters were deliberately indifferent. (Doc. 78, at 51). According to Coleman, however, C.O. Scott and C.O. Walters

downplayed the severity of the situation to their superiors. (Doc. 94, at 32). Coleman alleges Sgt. Shirey did the same when he reported to Lt. Heaster. (Doc. 94, at 32).

Defendants also note that C.O. Scott, C.O. Walters, and Sgt. Shirey each asked Coleman whether Ausley had threatened him, to which he replied no. (Doc. 78, at 46). Even if Coleman had been removed from his cell for further questioning, away from the presence of Ausley, Defendants argue that there would have been nothing to put them on notice that he was in danger. (Doc. 78, at 48-49). Further, Defendants submit that requiring them to remove inmates from their cells any time they requested to be let out would hinder their ability to rely on their own independent judgment. (Doc. 110, at 18). Coleman argues that they simply failed to do more in this situation based on the limited bed space in the facility. (Doc. 94, at 10).

Although another close call, given the record before the Court, a question of fact exists as to whether the C.O. Scott, C.O. Walters, and Sgt. Shirey were deliberately indifferent to the risk of harm posed to Coleman. Specifically, on his first night at SCI-Smithfield, Coleman made repeated attempts to be removed from his cell. In one of his requests made over the intercom, Coleman expressly stated that he feared for his life. While C.O. Scott, C.O. Walters, and Sgt. Shirey spoke with Coleman in person, they aver that Coleman did not specify why he wanted to be moved. Defendants also state that Coleman denied being threatened, did not appear to be afraid, and had been heard laughing in his cell with Ausley. Coleman, however, argues that he did not feel comfortable elaborating his concerns in front of Ausley. Defendants did not give him the opportunity to do so away from his cellmate, despite knowing that interviewing an inmate one-on-one is likely to solicit better information about a potential situation. Coleman's expert also posits that while

Defendants assumed Coleman was not afraid, Ausley's manipulation should have been concerning. Given the context of Coleman's actions, the Court is of the opinion that a reasonable juror could infer that the C.O. Scott, C.O. Walters, and Sgt. Shirey were on notice of a threat to serious harm by failing to remove Coleman from his cell, and were deliberately indifferent to that threat. Further, "whether [Defendants] acted reasonably or whether they should have done more is a factual inquiry that cannot be resolved on summary judgment." *Travillion v. Wetzel*, 765 F. App'x 784, 794 (3d Cir. 2019) (citing *Hamilton v. Leavy*, 117 F.3d 742, 748-49 (3d Cir. 1997)).

Therefore, the Court respectfully recommends that summary judgment be **DENIED** as to C.O. Scott, C.O. Walters, and Sgt. Shirey.

### b. *C.O. Nickum*

Defendants assert that summary judgment should be entered in favor of C.O. Nickum. (Doc. 78, at 51). Specifically, although he listened to Coleman and Ausley over the intercom, Defendants argue that C.O. Nickum had no direct interaction with Coleman. (Doc. 78, at 51). Thus, Defendants contend that it is undisputed that C.O. Nickum was not involved in the decision to keep Coleman in the cell. (Doc. 78, at 51). The record appears to support this position, and Coleman has not come forward with any evidence to the contrary.

During his deposition, C.O. Nickum stated that although he did a round at 10:00 PM, "everybody was quiet and everybody was sleeping." (Doc. 99-6, at 47). C.O. Nickum also stated that he briefly listened to Coleman and Ausley over the intercom, but that their conversation did not strike him as unusual. (Doc. 99-6, at 50-51). Further, other officers informed C.O. Nickum that Sgt. Shirey was coming to speak to Coleman. (Doc. 99-6, at

48). Coleman has not established that he expressly relayed his concerns to C.O. Nickum, or that C.O. Nickum reported to Sgt. Shirey about the situation. Thus, even when taking the facts in the light most favorable to Coleman, a reasonable juror could not find that Nickum was deliberately indifferent to a serious risk of harm.

Therefore, the Court respectfully recommends that Defendants' motion for summary judgment be **GRANTED** as to C.O. Nickum.

c. *Lt. Heaster*

With respect to Lt. Heaster, Defendants argue that he had no contact with Coleman, and justifiably relied on Sgt. Shirey's assessment of Coleman's request to be removed. (Doc. 78, at 70). Further, although Lt. Heaster made the ultimate decision to keep Coleman in his cell, Defendants contend that the totality of the information available allowed him to reasonably conclude that Coleman was not in danger. (Doc. 110, at 19). Coleman submits that Lt. Heaster, once being apprised of the situation by Sgt. Shirey, made no further effort to investigate. (Doc. 94, at 33). Coleman thus asserts that Lt. Heaster effectively ratified the underlying violation when he relied on Sgt. Shirey's account of Coleman's request for a cell re-assignment. (Doc. 94, at 33).

While not cause for commendation, the Court finds that no reasonable juror could infer that Lt. Heaster acted with deliberate indifference to a serious risk of harm by failing to further investigate the information Sgt. Shirey's gave to him. In his deposition, Lt. Heaster stated that he trusted the judgment of Sgt. Shirey. (Doc. 99-4, at 63). Indeed, if Sgt. Shirey had sought permission to question Coleman privately, Lt. Heaster stated that he would have given it to him. (Doc. 99-4, at 63). Lt. Heaster also indicated that he neither personally overheard Coleman speaking with Ausley over the intercom nor knew that Coleman had

36

pressed the intercom several times from inside his cell. (Doc. 99-4, at 32). Thus, the record does not support an inference that Lt. Heaster appreciated the risk of harm posed to Coleman based on the information he received by Sgt. Shirey and the Night Shift C.O.s. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (holding no deliberate indifference when an official fails "to alleviate a significant risk that he should have perceived but did not . . . ."); *see also Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986) (a prison official's negligent conduct that results in injury inflicted by an inmate on another inmate does not amount to a constitutional violation under the Eighth Amendment). While his failure to personally investigate Sgt. Shirey's report may demonstrate negligence, Coleman has not pointed to evidence that Lt. Heaster's decision to uphold his cell assignment amounts to deliberate indifference.

For this reason, the Court recommends that Defendants' motion for summary judgment be **GRANTED** as to Coleman's failure to protect claim asserted against Lt. Heaster.

### D.   Failure to Train and Supervise Claim – Count III

In Count III of the Second Amended Complaint, Coleman alleges that the Supervisory Defendants' failure to adequately train and supervise their subordinates renders them liable for the IRC Defendants, the Night Shift C.O.s, Sgt. Shirey, and Lt. Heaster's purported constitutional violations. (Doc. 54, at 29-31). Specifically, Coleman faults the Supervisory Defendants for failing to properly train and supervise staff members in the best practices of cell assignment, and failing to "implement and enforce policies that trained correctional staff how to receive complaints of actual and feared sexual assault from inmates housed with potential perpetrators." (Doc. 54, at 3, 29). Coleman further argues that the

Supervisory Defendants failed to employ policies, plans, or procedures that guided DOC staff members on how to appropriately handle complaints of sexual assault before an attack actually occurred. (Doc. 94, at 37-38). Moreover, Coleman is critical of how the Supervisory Defendants failed to facilitate the reporting of potential sexual assaults when inmates, who remained in the proximity of their feared attacker, were not able to safely communicate the threats they received. (Doc. 94, at 37-38).

In support of summary judgment, Defendants address Count III in the context of a failure to train claim, and not a failure to supervise claim.[13] (Doc. 78, at 52-62). Coleman thus asserts that his failure to supervise claim must stand, as its underlying allegations are deemed undisputed by Defendants. (Doc. 94, at 35-36). In their reply brief, however, Defendants submit that Coleman's purported failure to supervise claim is not materially distinct from his failure to train claim. (Doc. 110, at 19). Regardless of how Coleman seeks to impose liability on Defendants Wetzel, Fisher and Biser—in the context of a failure to supervise claim, a failure to train claim, or both—the Court finds that Count III cannot survive summary judgment.

It is well settled that "civil rights claims cannot be premised on a theory of *respondeat superior*," as individual government defendants must have personal involvement in the alleged wrongdoing. *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014). However, a prison official may be personally liable under § 1983 through two theories of supervisory liability: (1) if the official "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the

---

[13] The Court notes that failure to adequately supervise or train claims "are typically levied against municipalities." *Francis ex rel. Estate of Francis v. Northumberland Cty.*, 636 F. Supp. 2d 368, 400 (M.D. Pa. 2009).

constitutional harm;" or (2) "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Claims that allege a defendant's failure to supervise are a subcategory of the first theory of liability, also known as "policy or practice" liability. *Sarvey v. Wetzel*, No. 1:16-CV-00157, 2019 WL 235322, at *5 (W.D. Pa. Jan. 16, 2019). Claims that arise under the second theory of liability are often referred to as "direct" liability claims. *Palakovic v. Wetzel*, 854 F.3d 209, 225 n. 17 (3d Cir. 2017).

Here, as Coleman effectively contends that the Supervisory Defendants lacked, and were not trained regarding, adequate cell assignment and rape prevention procedures, he relies on a policy or practice theory of supervisory liability. *See Sarvey*, 2019 WL 235322, at *5. The Third Circuit has instructed:

> [T]o hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."

> *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

These elements are met and a supervisory liability claim is established where "the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries" or where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support" a finding of deliberate indifference. *Sample*, 885 F.2d at 1118.

Similarly, in order to establish a § 1983 claim for failure to train, "a plaintiff must (1) identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference and (2) demonstrate a close causal link between the alleged failure and the alleged injury." *Daniels v. Delaware*, 120 F. Supp. 2d 411, 423 (D. Del. 2000) (citing *Sample*, 885 F.2d at 1118); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [inadequately trained subordinates] come into contact."). "[A] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). In the absence of such a pattern, a plaintiff must show that the harm suffered was "*so* predictable that failing to train the [subordinates] amounted to *conscious disregard*" for plaintiff's rights. *Connick*, 563 U.S. at 71 (emphasis in original). However, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62; *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

In the case at bar, the simplest way for Coleman to impose liability against the Supervisory Defendants is to demonstrate that they failed "to respond appropriately when confronted by a pattern of injuries similar to [Coleman's], thereby suggesting deliberate indifference on the part of the [Supervisory Defendants]." *See Counterman v. Warren Cnty.*

*Corr. Facility*, 176 F. App'x 234, 240-41 (3d Cir. 2006). However, as noted by Defendants, Coleman has not pointed to any evidence of similar constitutional violations that occurred in the past. (Doc. 78, at 58; Doc. 110, at 20). Therefore, no reasonable juror could find that a pattern of injuries like Coleman's placed the Supervisory Defendants on notice of a constitutionally inadequate policy or practice. *See Sample*, 885 F.2d at 1118 (A supervisory liability claim is established where "the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries."); *Connick*, 563 U.S. at 62 ("[A] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."). For this reason, Count III cannot survive summary judgment based on a pattern of constitutional harm akin to that which Coleman suffered.

Alternatively, Coleman argues that an "obvious" risk existed based on the Supervisory Defendants' deficient policies and training. With respect to supervisory liability claims, "[w]hen the risk of harm is great enough, failure to respond to that risk can be circumstantial evidence of deliberate indifference." *Beers-Captiol*, 256 F.3d at 133-34. Similarly, with respect to failure to train claims, liability depends upon "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409. Coleman argues that the Supervisory Defendants were on notice of the risk of sexual assault, especially based on the training they provided to staff regarding the prevalence of such attacks and the need to report them after the fact, which obviated the need for training and supervision regarding proper cell assignment and reporting procedures. (Doc. 94, at 37).

### 1. Cell Assignment Policy

As to the cell assignment policy, Defendants argue that this is not a case that falls within the narrow exception for liability in the absence of a pattern or practice of similar violations. (Doc. 78, at 58). In support, Defendants cite to the existence of Policy 5.1.1 regarding housing procedures, and DC-ADM 008 regarding sexual assault prevention. (Doc. 78, at 41). Defendants state that DOC staff members received training on the PREA, which included training regarding the characteristics of likely victims and perpetrators. (Doc. 78, at 54). Defendants also point to the PREA basic training that was in effect as of December 2013, which discussed the prevention of, and intervention in, sexual assaults. (Doc. 78, at 55). Further, Defendants note that Defendant Biser conducted a course at SCI-Smithfield on or about February 21, 2014, merely weeks before the incident, which instructed staff members on certain updates to DC-ADM 008. (Doc. 78, at 57). Based on this evidence, Defendants argue that the DOC's mandatory training addressed the topics that Coleman alleged it did not cover. (Doc. 78, at 57).

In response, Coleman argues that while DC-ADM 008 put employees on notice of the prevalence of sexual assault, it did not implement protocols for proper cell assignment and inmate screening. (Doc. 94, at 36). Further, Coleman notes that no overall directive to utilize DC-ADM 008 existed when making cell assignments. (Doc. 94, at 36). The expert report of Ms. Woodford also indicates that SCI-Smithfield lacked appropriate policies, practices, or systems to adequately assess inmates for double celling, especially since they utilized the PACT instead of the PRAT when the incident occurred. (Doc. 93-2, at 24). Defendants, however, assert that DC-ADM 008 specifically implemented screening

procedures for inmates, and assigned them a Z-Code if the screening revealed that they were at risk of sexual victimization or predation. (Doc. 110, at 21).

Even when construed in the light most favorable to Coleman, the shortcomings he identified do not meet the high threshold required to establish deliberate indifference by the Supervisory Defendants. Specifically, the undisputed evidence demonstrates that DC-ADM 008 discussed the elevated risk of sexual assault when inmates with certain characteristics were celled together. The record further reveals that the DOC staff members received training on these characteristics in the context of the PREA. Thus, given the existence of such policies and training requirements, the Supervisory Defendants' failure to implement cell assignment procedures that further utilized these directives did not pose an obvious risk of harm. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 137-38 (3d Cir. 2001) (holding that defendant juvenile detention center officials' failure to implement standard policies and procedures evinced negligence but did not serve to show that the risk was "so great and so obvious" that defendants had actual knowledge of an unreasonable risk). Additionally, given the staff's training regarding predictors of sexual predation or victimization, a reasonable juror could not find that the type of injury suffered by Coleman was a "highly predictable consequence" of the Supervisory Defendants' allegedly deficient cell assignment policy. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).[14]

---

[14] As discussed *supra*, a genuine issue of material fact exists as to whether the IRC Defendants' decision to house Coleman with Ausley, despite evidence that would allow a reasonable juror to infer that an imbalance of power existed between them, amounted to deliberate indifference. However, any failure by their subordinates "to follow protocols does not necessarily indicate that [the Supervisory Defendants] failed to train or supervise them with respect to the same." *See Francis ex rel. Estate of Francis v. Northumberland Cty.*, 636 F. Supp. 2d 368, 401 n. 71 (M.D. Pa. 2009).

Because no dispute of material fact exists as to whether the cell assignment policy created an obvious risk of harm in the absence of a pattern of similar incidents, the Court respectfully recommends that Defendants' motion for summary judgment be **GRANTED** as to the failure to train and supervise claim against the Supervisory Defendants.

### 2.  Handling of Potential Threats

With respect to how staff received reports of potential sexual assaults, Defendants state that such a theory of deficient training is too specific to be an obviously necessary component of prevention training. (Doc. 78, at 59). Defendants claim that that the decision to remove an inmate from a cell to facilitate further investigation requires a certain degree of investigatory judgment and thus is not an obvious training principle that requires application in all instances of prisoner complaints. (Doc. 78, at 59). Nonetheless, Coleman asserts that no procedure existed at the time of the incident that instructed DOC employees on how to respond to complaints of feared assault. (Doc. 94, at 12). According to Coleman, this deficiency was "so obvious" that the failure to provide new or different training evinced deliberate indifference on the part of the Supervisory Defendants. (Doc. 94, at 37).

Here, Defendants have shown that DOC training instructed staff on the principles of the PREA, as well was their responsibilities for receiving reports of sexual abuse or harassment from inmates. (Doc. 78, at 62). While the then-existing policies may not have expressly referenced how to handle complaints of feared or potential sexual assault, Defendants point to evidence that preventative training occurred. Further, Coleman has not submitted any countervailing evidence that the failure to implement such a policy did not comport with then-prevailing standards. Accordingly, while a such a policy would have been helpful under the circumstances, there is no dispute of material fact as to whether the

need for a more specific preventative practice posed a plainly obvious risk of constitutional harm, or whether Coleman's injury was a highly predicable consequence of such an allegedly deficient procedure. Therefore, it is recommended that summary judgment be **GRANTED** in favor of the Supervisory Defendants as to Coleman's failure to train and supervise claim that involves how to handle complaints of potential assault.

### E.   QUALIFIED IMMUNITY[15]

Finally, Defendants raise the affirmative defense of qualified immunity in their motion for summary judgment. (Doc. 78, at 63-71). Qualified immunity provides not merely a "defense to liability," but rather "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Specifically, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). An official who reasonably believes his conduct to be lawful is thus protected, as qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

---

[15] As the Court has already found that summary judgment should be entered in favor of Defendant Patton, C.O. Meyers, C.O. Glass, C.O. Jones, C.O. Rinehart, C.O. McConaughey, Defendant Wetzel, Defendant Fisher, and Defendant Biser, it declines to consider whether these Defendants are also subject to qualified immunity.

The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Further, "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 131 S. Ct. at 2080; *see also Pearson*, 555 U.S. at 236 ("[D]istrict courts…should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Here, Defendants primarily challenge whether the conduct of which Coleman complains violated a clearly established right. (Doc. 78, at 63-71). As such, the Court will consider the second prong of the qualified immunity analysis first. *See al-Kidd*, 131 S. Ct. at 2080.

"A right is 'clearly established' if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 585 (M.D. Pa. 2013). A right may be clearly established without "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083. "In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012); *see also al–Kidd*, 131 S.Ct. at 2084 ("We have repeatedly told courts ... not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted). As such, "[t]he dispositive question is 'whether the violative nature of

46

*particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (emphasis in original) (*quoting al–Kidd*, 131 S.Ct. at 2084).

Here, Defendants characterize the conduct at issue as compliance with specific sexual assault protocols. (Doc. 78, at 63). Specifically, as to Count I, Defendants argue that the failure to adhere to a particular sexual assault screening, cell assignment procedure, or training protocol under the PREA does not violate the United States Constitution.[16] (Doc. 78, at 66). With respect to Count II, Defendants assert that they were not constitutionally required to remove Coleman from his cell for further questioning, let alone change his cell assignment. (Doc. 78, at 69-70). In opposing summary judgment, however, Coleman argues that the constitutional right at issue is not his entitlement to PREA-compliant protocols, but rather his right to be protected from violence at the hands of other prisoners known to pose

---

[16] In support of their argument, Defendants cite to *Walsh v. N.J. Dep't of Corr.*, No. CV 17-2442 (JBS-AMD), 2017 WL 3835666, at *3 (D.N.J. Aug. 31, 2017), for the proposition that the PREA does not create a private right of action but is rather a funding statute that concerns conditions placed upon federal grants. (Doc. 78, at 67). Indeed, courts have consistently held that the PREA's provisions provide no basis for private enforcement under 42 U.S.C. § 1983. *E.g. Njos v. United States*, No. 3:14-CV-1960, 2016 WL 1720816, at *3 (M.D. Pa. Apr. 29, 2016); However, the *Walsh* court also explained:

> That the PREA does not create a private cause of action on behalf of a prisoner does not mean that this statute and the national standards are meaningless in litigation. If a prisoner has a constitutional cause of action, such as for a deliberate indifference to dangerous conditions of confinement, the fact that a prison facility may have failed to adopt and enforce the national standards may, or may not, be evidence of deliberate indifference depending on the circumstances. That issue is not presented in this case since Plaintiff presents no cognizable constitutional claim.

> *Walsh*, 2017 WL 3835666, at *3 n. 5; *accord Sarvey v. Wetzel*, No. 1:16-CV-00157, 2019 WL 235322, at *6 n. 11 (W.D. Pa. Jan. 16, 2019).

Nonetheless, plaintiffs "may not attempt to enforce statutes or policies that do not themselves create a private right of action [such as the PREA] by bootstrapping such standards into a constitutional deliberate indifference claim." *Bowens v. Wetzel*, 674 F. App'x 133, 137 (3d Cir. 2017).

a risk of harm. (Doc. 94, at 45). The Court finds, however, that Defendants' definition is too narrowly construed with respect to the conduct of the IRC Defendants, C.O. Scott, C.O. Walters, and Sgt. Shirey.

Accordingly, the right at issue is a prisoner's right to be free from sexual assault inflicted by other prisoners because of the deliberate indifference of prison officials. This right was clearly established at the time Ausley attacked Coleman on March 6, 2014. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 832–34, 848–49 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (quotations omitted)); *accord Hamilton v. Leavy,* 117 F.3d 742, 746 (3d Cir. 1997) (holding that that a "prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."); *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) ("[T]he constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation."); *Leach v. Drew,* 385 F. App'x 699, 700–01 (9th Cir. 2010) (affirming denial of qualified immunity defense because it was clearly "established that the failure of a prison official to respond to a known, credible threat to an inmate's safety constituted a violation of the inmate's Eighth Amendment rights."); *Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga.,* 400 F.3d 1313, 1320 (11th Cir. 2005) ("A prisoner has a right, secured by the eighth ... amendment[ ], to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates[.]" (internal quotation marks and citation omitted)); *cf. al-Kidd,* 131 S.Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the ... constitutional question beyond debate."). Accordingly, when the IRC Defendants decided to pair Coleman with Ausley, or acquiesced in the same,

it is possible that a reasonable juror could find that their failure to compare the inmates' differing characteristics, which suggested an elevated risk of assault, amounted to deliberate indifference. Similarly, when Defendants kept Coleman in a cell with Ausley, despite his pleas to be removed and inability to elaborate his concerns away from the presence of Ausley, a reasonable factfinder could infer that C.O. Scott, C.O. Walters and Sgt. Shirey acted with deliberate indifference when they failed to do more. Moreover, as discussed *supra*, Coleman has raised a genuine issue of material fact as to whether the IRC Defendants, C.O. Scott, C.O. Walters, and Sgt. Shirey were deliberately indifferent to a serious risk of harm posed by assigning him to, and then failing to remove him from, a cell with Ausley. Thus, these remaining Defendants have not met their burden of demonstrating that they are entitled to qualified immunity for their conduct.

Therefore, it is recommended that Defendants' summary judgment on the grounds of qualified immunity be **DENIED** as to Defendant Lightner, Defendant Snyder, Defendant Garman, Defendant Peck, C.O. Scott, C.O. Walters, and Sgt. Shirey.

## V.   RECOMMENDATION

Based on the foregoing, it is recommended that:

1. Defendants' motion for summary judgment (Doc. 75) be **GRANTED** in part and **DENIED** in part;

2. Defendants' motion for summary judgment on Counts I and II of the Second Amended Complaint be **GRANTED** as to Defendants Patton, Meyers, Glass, Jones, Rinehart, and McConaughey;

3. Defendants' motion for summary judgment on Count II of the Second Amended Complaint be **DENIED** as to Defendants Lightner, Peck, Garman, and Snyder;

4. Defendants' motion for summary judgment be on Count I of the Second Amended Complaint be **DENIED** as to Defendants Shirey, Scott, and Walters;

5. Defendants' motion for summary judgment be on Count I of the Second Amended Complaint be **GRANTED** as to Defendants Nickum and Heaster;

6. Defendants' motion for summary judgment on Count III of the Second Amended Complaint be **GRANTED** as to Defendants Wetzel, Fisher, and Biser;

7. Defendants' motion for summary judgment on the grounds of qualified immunity be **DENIED**; and

8. The Clerk of Court be directed to terminate Defendants Patton, Meyers, Glass, Jones, Rinehart, McConaughey, Nickum, Wetzel, Fisher, and Biser as parties to this action.

**BY THE COURT:**

Dated: July 18, 2019

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF PENNSYLVANIA

DARREN DARNELL COLEMAN,

                Plaintiff,

      v.

JOHN E. WETZEL, et al.,

                Defendants.

CIVIL ACTION NO. 1:15-CV-00847

(CONNER, C.J.)
(MEHALCHICK, M.J.)

### <u>NOTICE</u>

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **July 18, 2019**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: July 18, 2019**

                *s/ Karoline Mehalchick*
                **KAROLINE MEHALCHICK**
                **United States Magistrate Judge**